COMMERCIAL PACIFIC CABLE CO. v. PHILIPPINE NAT. BANK.

(District Court, S. D. New York. January 26, 1920.)

1. TELEGRAPHS AND TELEPHONES ⊜⟹33(2)—PHILIPPINE NATIONAL BANK NOT ENTITLED TO GOVERNMENT RATES, WITH PRIORITY OF SERVICE.

Philippine National Bank, organized under charter granted by the Philippine Legislature, providing that 51 per cent. of its stock shall be owned by the Philippine government and voted by the Governor General and presiding officers of the two houses of the Legislature, the remaining stock being subject to general ownership, which bank, besides being government depository, does a general commercial business in the Philippines, with a branch in New York City, *held* not a "department of the United States government" nor "agent of a department," within Rev. St. § 5266 (Comp. St. § 10075), and entitled as such to priority of service and government rates on cablegrams to and from its New York branch.

2. UNITED STATES ⊜⟹76—EFFECT OF OWNERSHIP OF STOCK IN A BANK.

The fact that the United States is a stockholder in a bank does not vest the corporation with any rights which belong to the United States as a sovereign.

3. TELEGRAPHS AND TELEPHONES ⊜⟹33(1)—IMPLIED CONTRACT TO PAY USUAL COMMERCIAL RATES FOR SERVICE.

The fact that a bank, claiming the right as a department of the government, sent and received cablegrams through a government bureau, by which it obtained priority of service and the reduced government rate, which was charged to and paid by the bureau, but subsequently repaid by the bank, *held* not to prevent the transactions from raising an implied contract by the bank to pay the cable company the usual commercial

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

rates for the service rendered, on a determination that its claim to preference was unfounded.

In Equity. Suit by the Commercial Pacific Cable Company against the Philippine National Bank. On motion to strike out defenses in answer. Sustained.

Charles E. Hughes and William W. Cook, both of New York City, for plaintiff.

Nathan F. Giffin and John W. Hannon, both of New York City, for defendant.

MAYER, District Judge. The suit is brought to enjoin defendant from continuing to send its cablegrams as United States government cablegrams and in the name of officials of the United States, and from taking any steps to send its cablegrams over plaintiff's cables other than as a member of the public and on paying the full tolls and the United States tax thereon and under its own name or the names of its officers and agents, the same as any other member of the public, and for an accounting by defendant for such part of the full tolls on cablegrams sent by defendant as exceeds the tolls actually collected by plaintiff from the United States, and also for an accounting for the government taxes thereon.

The hearing is pursuant to an order under rules 29 and 33 (198 Fed. xxvi, xxvii, 115 C. C. A. xxvi, xxvii), directing that testimony be taken on the point of law as to the sufficiency of the answer interposed by defendant, by calling up and disposing of the same before final hearing, and also separately hearing and disposing before the trial of the principal case of the following defenses of defendant:

(1) That it is a department of the government of the United States, and that its officers and agents are officers and agents of the government of the United States, within the meaning of the Post Road Act of Congress of July 24, 1866 (Comp. St. §§ 10072–10077), and that telegrams sent by defendant and its officers and agents are messages of the government of the United States or the officers and agents thereof within the meaning of said act, and hence that defendant was and is entitled to send the same through the Bureau of Insular Affairs of the United States government as an intermediary at the government half rates and with precedence as to transmission.

(2) That, so far as plaintiff is concerned, defendant was and is entitled to send messages from and to its main office in Manila, Philippine Islands, to and from its branch office in New York, through the Bureau of Insular Affairs of the United States government as an intermediary at the government half rates and with precedence as to transmission.

(3) That in the transmission by defendant in messages passing between the Bureau of Insular Affairs of the United States government and the Governor General and acting Governor General of the Philippine Islands, of messages between the branch office of the defendant in the city of New York and the main office in the city of Manila, defendant incurred no liability to plaintiff.

(4) That the telegrams heretofore sent by defendant which are the

subject of complaint in this suit were telegrams between the several departments of the government and their officers and agents.

(5) That as matter of law plaintiff is not entitled to recover from defendant any sum or sums of money by reason of any acts of defendant set forth and complained of in plaintiff's complaint.

Plaintiff is a New York corporation, owning and operating submarine cables from San Francisco to Manila, and defendant is a banking corporation organized under and in accordance with a special act of the Legislature of the Philippine Islands, and having its main office in Manila and a branch office in New York City. The Philippine government owns from 85 to 90 per cent. of the capital stock of the bank, but not all, and it is clearly established that the bank does a general banking business, receives deposits from private individuals, and does business with and for them.

The important question at the threshold of the case is whether the bank is a department of government. If so, it is entitled to certain privileges accorded by law, to which it would not be otherwise entitled. The Post Road Act of Congress (R. S. §§ 5263–5269, inclusive [Comp. St. § 10075 et seq.]) provides in section 5266 as follows:

"Telegrams between the several departments of the government and their officers and agents, in their transmission over the lines of any telegraph company to which has been given the right of way, timber, or station lands from the public domain shall have priority over all other business, at such rates as the Postmaster General shall annually fix."

The rate charged for government messages passing over plaintiff's cables is approximately half the rate charged for nongovernment messages. Thus the government not only has the advantage of paying only half rates, but of having its messages gain priority. The testimony shows that, as between the priority of messages sent by the government and ordinary nongovernment cablegrams, the difference is 10 days as matter of time. Thus defendant, by virtue of the priority obtained by it, has had a great advantage over other financial institutions, both in the Philippines and in the United States, and merchants who are customers of defendant bank have obviously had a great advantage over noncustomer merchants.

Prior to the commencement of this suit the procedure was as follows: A message in plain language was sent from defendant's New York branch to the Bureau of Insular Affairs at Washington and then coded by the Bureau. As thus coded, the message was sent by the Bureau from Washington to San Francisco, via New York, and thence to Manila, addressed to the Governor General of the Philippine Islands. So much of the message as was for defendant bank was then decoded and forwarded by the Governor General's office to the main office of the Bank at Manila. The same procedure, reversed, obtained when a message was sent from Manila to New York. Numerous messages, in evidence, show that the business therein referred to concerned the commercial business of the bank or its customers, who thus had the advantage of half rates and priority.

After the commencement of this suit, defendant discontinued the practice complained of in the suit, and a new plan has been adopted, to

which defendant strongly objects. Under this new plan, messages are sent to and from Manila and New York in the same way—i. e., in government code—but marked without priority and commercial. According to plaintiff, this system results in confusion and errors, with consequent loss to defendant, and that no one else has received this advantage, resulting from the War Department sending messages in this way.

Messages have three rates, viz.: (1) The ordinary rate; (2) the government rate, about half; (3) the urgent rate (very limited as to number of messages allowed any one customer), three times the ordinary rate. Thus the difference between the ordinary rate on the one hand, and government or urgent rate, as the case may be, on the other, runs into large sums on a substantial number of messages.

While defendant thus gained the advantage of this large sum of money (as well as of priority), it is rather amusing to note that, at the same time, the government, via the Treasury Department (internal revenue), demands a tax on the messages. In this connection the complaint alleges:

"The complaint alleges that the regulations of the Treasury Department under the Revenue Act of 1918, art. XII, Regulation No. 57, required that, while messages relating to government business need not pay any tax, yet, where the tolls on messages are not paid by the United States Treasurer, or the District of Columbia, or a state or territory, the tax applied; * * * and the complaint further alleges that the Treasury Department had ruled that, even if the tolls are originally paid by the United States government, yet if they are subsequently refunded to the government the messages would have to pay a tax. The answer does not deny this, but, on the contrary, expressly admits that the defendant has refunded to the Bureau of Insular Affairs the tolls on these messages. * * *"

The principal contentions are thus stated by the parties:

For plaintiff:

I. This bank's cablegrams are not "telegrams between the several departments of the government and their officers and agents," and hence were not entitled to the government rate, nor to priority of transmission.

II. The mere fact that the Philippine government owns a majority of the capital stock of the defendant does not make the latter a department of the United States government.

III. The defense that there is no privity of contract between the complainant and defendant is untenable.

For defendant:

Defendant does not contend that, because the government of the Philippine Islands is a stockholder in the bank, or because of the control exercised over the defendant by the government of the Philippine Islands, it is immune from suit; but its defense to this suit is based upon two propositions:

A. That, because of the relationship existing between the government of the United States and the Philippine Islands, the messages passing between the branch of defendant in the city of New York and its main office in the city of Manila were, in fact, governmental messages, and hence that they were properly sent through the Bureau of Insular Affairs at governmental rates and with priority of service.

B. That, even though the messages in question should be held to be not governmental messages, and hence not entitled to the governmental rate and priority of service, nevertheless, there being no contract between plaintiff and defendant with respect to the sending of these messages, and because of the fact that plaintiff's contract was directly with the government of the United States, and defendant's contract was likewise directly with the government

of the United States, if there be any liability to plaintiff because of the fact that it has received less than the usual commercial rate, this liability is a liability of the United States government, and not of this defendant.

[1] 1. The Post Road Act, supra, seems clear enough. It limits the telegrams entitled to priority and reduced rates to those "between the several departments of the government and their officers and agents." Unless defendant is a department of the government, or an officer or agent thereof, it was not and is not entitled to priority and the reduced rate. Construing the act, Attorney General Williams, in an opinion dated July 10, 1873 (14 Opin. of Attys. Gen. 278), said:

"I think that the word 'between,' in said section, should be taken distributively, as applying to communications between, first, one department and another; second, a department and its officers and agents; third, a department and the officers and agents of another department; fourth, the officers and agents of the same department; and, fifth, the officers and agents of one and those of another department. This construction is, in my judgment, in conformity with the reason of the statute."

On April 2, 1918, the Treasury Department, in Regulation No. 10, in regard to sending official telegrams, made the following provision:

"Government telegraph rates, established conformably to law, are intended to apply to official government business exclusively, and no private individual, association, company, or corporation should in any way be benefited thereby. In cases where it becomes necessary to use the telegraph on any business in the special interest of any private person or persons, in which the government has no interest, the party for whom the service is performed will be required to pay for the messages both ways at commercial rates."

There is also the Treasury Regulation as to the collection of taxes on telegrams or cablegrams under Revenue Act 1918, § 500, f, g, h (Comp. St. Ann. Supp. 1919, § 6309⅓a), being article XII, Reg. No. 57, as follows:

"Telephone, telegraph, cable, and radio dispatches, messages and conversations relating to government business, which originate in the United States and which are a charge against the Treasurer of the United States, the District of Columbia, a state, or territory, and are paid from the funds thereof, are exempt from the tax. Messages, conversations, and dispatches which are not paid from such funds are not exempt from tax, even though they relate to government business."

In addition to the foregoing is the plain language of the statute evidencing the intent of the Congress to restrict the advantages within limits clearly stated. Is, then, the Philippine National Bank a department of government, or an agent of the government, so far as concerns the messages here considered?

It is unnecessary to recite the governmental history of the Philippines and their relation to the United States. Undoubtedly the United States has endeavored to develop the commerce of the Islands. In Act July 1, 1902 (32 Stat. at Large, part 1, page 691), it was provided, inter alia:

"Bureau of Insular Affairs.

"Sec. 87. That the Division of Insular Affairs of the War Department, organized by the Secretary of War, is hereby continued until otherwise provided, and shall hereafter be known as the Bureau of Insular Affairs of the

War Department. The business assigned to said bureau shall embrace all matters pertaining to civil government in the island possessions of the United States subject to the jurisdiction of the War Department; and the Secretary of War is hereby authorized to detail an officer of the army whom he may consider especially well qualified, to act under the authority of the Secretary of War as the chief of said bureau; and said officer while acting under said detail shall have the rank, pay, and allowances of a colonel."

It will be noted that the foregoing section specifically defines the "business" of the bureau as embracing "all matters pertaining to the civil government" in the Islands. Certainly the bank is not a part of the "civil government," unless a national bank can be said to be a part of the civil government of the United States.

The act creating the defendant bank provided that the government of the Philippine Islands should subscribe at the outset for 101,000 shares out of a total authorized issue of 200,000, and that as part payment for these shares it should transfer to the bank all the assets of the Government Agricultural Bank, which was owned absolutely by the government of the Philippine Islands; the government of the Philippine Islands is required at all times to own at least 51 per cent. of the stock of the bank; and at the present time it owns approximately 85 per cent. of the outstanding stock. The voting power of this stock is vested exclusively in a committee, consisting of the Governor General, an official appointed by the President of the United States, the President of the Philippine Senate, and the Speaker of the Philippine House.

The affairs and business of the bank are managed by a board of directors consisting of the president, the vice president, and five elective members. The president and the vice president are appointed by the Governor General, with the advice and consent of the Philippine Senate, and the remaining five directors are elected in accordance with the General Corporation Law. The approval of the Governor General and the presiding officers of the two houses of the Philippine Legislature is necessary for various corporate acts on the part of the bank.

The Attorney General of the Philippine Islands is the attorney for the bank, and the insular auditor, a person appointed by the President of the United States, is ex officio auditor of the bank. Power is given to the Governor General, with the advice and consent of the Philippine Senate, to remove various officers of the bank. In respect of the bank as a governmental agency designed to build up the wealth of the Islands, the following clauses are found in the charter:

Fifty per cent. of its capital and surplus may be loaned on notes secured by mortgages on real estate. This, it is true, is an unusual provision; the national banks in the United States being prohibited from making loans secured by mortgages on real estate.

It is given the exclusive use of the word "National" with respect to banking business.

It is the official governmental depositary.

It is authorized to purchase or discount notes, drafts, or bills of exchange issued and drawn for agricultural, industrial, or commercial purposes, to make loans on or to discount notes secured by harvested and stored crops, to make loans to agriculturists in installments on

standing crops of the natural products of the Philippine Islands, such as rice, hemp, copra, tobacco, sugar, etc., and generally to make advances or discount paper for agricultural, manufacturing, industrial, or commercial purposes.

It is authorized to erect bonded warehouses for depositing therein goods given to it in pledge.

When authorized by the Governor General and the presiding officers of the two houses of the Philippine Legislature, it is authorized to guarantee, both as to principal and interest, or either, bonds issued by incorporated companies for the erection of and additions to industrial plants or manufactories principally used for the manufacture and preparation of the products of the Philippine Islands, and subject to the same approval the bank is authorized to purchase bonds issued by any duly incorporated company engaged in the manufacture or preparation of products of the Philippine Islands.

In view of the foregoing and other provisions, it is argued that the interest of the United States is so inextricably mingled with the purposes and administration of the bank and the welfare of the Islands and their government that the bank in effect is a department or agent of the government of the United States. But, although in the complex problems attendant upon the administration of the Philippine government, in the interest of its welfare and that of the United States, the bank has, of course, many close relations with the United States government, nevertheless there may be private ownership to the extent of 49 per cent. of the stock of the bank, and it is permitted to do and does do a commercial business for profit, like any other bank. A financial institution so constituted cannot be a "department" of the United States government, or an "agent," in the sense of section 5266 of the Post Road Act, supra.

[2] 2. By analogy, the proposition supra is borne out in principle by United States v. Planters' Bank, 9 Wheat. 904, 6 L. Ed. 244, from which, in the circumstances, the following may be quoted:

"It is, we think, a sound principle that, when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. * * * As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power, in the management of the affairs of the corporation, than are expressly given by the incorporating act. The government of the Union held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank in the sense of the Constitution. So with respect to the present bank. Suits brought by or against it are not understood to be brought by or against the United States. The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter."

See, also, Panama R. R. Co. v. Curran, 256 Fed. 768, —— C. C. A. ——; City of Los Angeles v. Los Angeles Electric Corp., 251

U. S. 32, 40 Sup. Ct. 76, 64 L. Ed. —— (decided December 8, 1919, affirming 241 Fed. 912).

It is difficult to see how McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, cited by defendant, is in point.

[3] 3. The proposition that there is no privity of contract between the parties, and that the recovery by plaintiff, if aggrieved, must be from the United States, seems wholly without merit. The fundamental theory of such relations between customers of telegraph companies and shippers and interstate carriers is that the very nature of the transaction creates an obligation to comply with statutory requirements and a liability for failure so to do.

Uniformity and nondiscrimination have grown to be necessary to the proper conduct of those interstate utilities. Interstate Commerce Act, §§ 3, 10 (Comp. St. §§ 8565, 8574); Western Union Tel. Co. v. Call Pub. Co., 181 U. S. 92, 21 Sup. Ct. 561, 45 L. Ed. 765; Pittsburgh, Cincinnati, etc., Ry. Co. v. Fink, 250 U. S. 577, 40 Sup. Ct. 27, 63 L. Ed. 1151 (decided November 10, 1919). The fact that, through an erroneous construction of the law, a government official or officials may have been mistaken as to defendant's rights, cannot transfer defendant's obligations from itself to the government, and thereby compel plaintiff to seek redress from the government.

The evidence shows that defendant was not compelled to cable via the Bureau of Insular Affairs, but that it willingly acceded to the practice established by the bureau. In view of the sharpness of the controversy, it is but fair to state that the military officer heretofore in charge (who is not a lawyer) looked upon defendant as a governmental agency, and sincerely believed he was right in that view.

The present proceeding is, of course, concerned only with the sufficiency of defenses. Although it is stated that the previous practice of defendant has been discontinued, the suit was well laid when it was commenced. The present practice (i. e., since this suit has been commenced) is not before the court. It has been referred to supra, so that counsel may be informed that the point has not been overlooked; but it has not as yet been definitely pleaded by plaintiff, and therefore no answer in regard thereto has been interposed.

Upon the present pleadings, I am of opinion that the defenses involved are insufficient in law, and plaintiff may have an appropriate decree.

Settle the decree on three days' notice. If there should be any difference as to the form of the decree, I will arrange to hear counsel in regard thereto.