FEDERAL SUGAR REFINING CO. v. UNITED STATES SUGAR EQUALIZATION BOARD, Inc.

(District Court, S. D. New York. June 24, 1920.)

1. **Money received ⬤═9—Vendor, preventing performance of another vendor's contract and supplying the goods, held liable.**

   A complaint *held* to state a cause of action for money had and received, where it alleged that plaintiff contracted to sell for export 4,500 tons of sugar to a commission representing the Norwegian government; that the president of defendant corporation, who was also head of the sugar division of the Government Food Administration, arbitrarily and wrongfully refused to approve the issuance of a license for the export of such sugar; that defendant, through its president or other officers, by wrongfully representing that no export license could be obtained for sugar unless bought from defendant, and that defendant was authorized to fill all contracts, induced the commission to purchase the sugar from defendant and to refuse to accept it from plaintiff, whereupon an export license was issued, and that defendant made a large profit on the transaction.

2. **United States ⬤═125—State corporation, created by direction of President, subject to suit under state law.**

   A corporation organized under the laws of a state, although it is incorporated by direction of the President in the exercise of a discretionary power, and is used as a government agency and its stock is owned solely by the government, has only the powers conferred, and is subject to all the liabilities imposed, by the laws of the state, including liability to suit, and a suit against it is not one against the United States.

3. **Torts ⬤═16—Not a defense that act was directed by government officer.**

   In an action against a corporation for a tort, it is no defense that the act complained of was done by direction of the President or other officer of the government.

4. **United States ⬤═125—Ownership of corporation by government not a defense.**

   In an action against a state corporation for money had and received, the fact that the profit from the tortious transaction, sought to be recovered, has become a part of the assets of the corporation, which is owned solely by the United States government, *held* not to constitute a defense.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by the Federal Sugar Refining Company against the United States Sugar Equalization Board, Incorporated. On demurrer to answer. Demurrer sustained.

To the complaint herein the answer has interposed three affirmative defenses, and to each and every one of these defenses plaintiff has demurred. The complaint sets forth three causes of action, and, omitting formal allegations, the essential features set forth in these causes of action are as follows:

*First Cause of Action.*—Substantially all the allegations are on information and belief. Defendant is a Delaware corporation. The Norwegian Government Food Commission was the official agency of the kingdom of Norway for the purpose of securing food supplies on behalf of the kingdom, including the purchase of sugar in the United States for shipment to Norway. On or about August 21, 1917, plaintiff entered into a written agreement with the Norwegian Commission, whereby the commission agreed to purchase from plaintiff, and plaintiff agreed to sell and deliver to the commission, 4,500 tons of refined sugar at $6.60 per 100 pounds for granulated sugar, and upon certain other terms. This contract was entered into prior to the placing of any embargo upon the export of sugar from the United States or the promulgation of any regulation governing the establishment or maintenance of governmental control of the importation, manufacture, storage, or distribution of sugar in the United States.

On or about August 10, 1917, under the authority of an act of Congress approved August 10, 1917, and known as the Food and Fuel Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), the President of the United States by executive order established the United States Food Administration, and appointed the Food Administrator, and vested in him all of the powers in the act conferred upon the President, so far as the same applied to foods. The Food Administrator appointed one Rolph as head of the Sugar Division of the Food Administration, and all of the powers of the Food Administration, so far as related to governmental control of sugar, were thereafter exercised by Rolph, as head of the Sugar Division, as a consequence whereof Rolph was vested with and exercised complete control over the sugar industry in the United States.

On or about August 27, 1917, under authority conferred by an act of Congress approved June 15, 1917, known as the Espionage Act (40 Stat. 217)', the President of the United States, by proclamation, prohibited the exportation of sugar from the United States except in accordance with regulations prescribed by him. Under said regulations the power to issue export licenses, thereunder required, was vested in the Exports Administrative Board, and the proclamation and regulations thereunder and the embargo thereby established were enforced continuously thereafter during the times covered by the subsequent events alleged in the complaint. The Exports Administrative Board required that all licenses for the exportation of sugar be approved by the Food Administration, and under this requirement no license for the exportation of sugar was granted or could be secured, except upon the approval of Rolph, as head of the Sugar Division, as a consequence whereof Rolph was enabled to prevent the exportation of sugar from the United States.

The Norwegian Commission requested the Exports Administrative Board or its successor to issue a license for the exportation of the 4,500 tons of sugar above referred to, and this request was referred to Rolph, as head of the Sugar Division, and was disapproved by him, and because of such disapproval the request was refused, and thereafter repeated requests similarly made, both by plaintiff and by the Norwegian Commission, were refused by Rolph. Because of the refusal to issue the license the Norwegian Commission was unable to take delivery of the same under the contract or to furnish shipping instructions therefor, and by reason of this on or about February 2, 1918, by mutual agreement the contract between plaintiff and the Norwegian Commission was modified by extending the date of delivery to June 1, 1918; and thereafter, on or about June 6, 1918, there was further modification by extending the date of delivery to October 1, 1918, and by fixing the price for the sugar at $6.60

per 100 pounds, or any higher price demanded by the United States government.

Rolph, while head of the Sugar Division, and on or about July 23, 1918, subscribed to the certificate of incorporation of defendant and was one of its incorporators, and immediately thereafter was elected one of the directors and president of defendant, and duly qualified as such, and from July 23, 1918, Rolph was continuously the president and a director of defendant. In August or September, 1918, defendant, through its president, Rolph, or its other officers and agents, "well knowing that the aforesaid contract between plaintiff and said Norwegian Government Food Commission was in full force and effect, and wrongfully designing and contriving to deprive the plaintiff of the benefits of its aforesaid contract, and with the wrongful intent to secure the benefits of said contract for itself, wrongfully represented to the said Norwegian Government Food Commission that no refined sugar could be exported from the United States, nor would any license for the exportation of any sugar be issued, unless such sugar was purchased from or through the defendant, and further wrongfully represented that the said commission could not secure said forty-five hundred (4,500) tons of sugar contracted to be purchased from the plaintiff as aforesaid, except through the defendant, and wrongfully induced the said commission to believe said representations to be true; that prior to and at the time said wrongful representations were made to the said commission the said George M. Rolph, as head of the said Sugar Division, arbitrarily and in abuse of the discretionary power vested in him as such, refused and continued to refuse to approve the issuance of a license for the exportation of the said forty-five hundred (4,500) tons of sugar contracted to be sold by the plaintiff as aforesaid, as a consequence whereof the said commission, relying upon the aforesaid wrongful representations and believing the same to be true, agreed to and did purchase from the defendant forty-five hundred (4,500) tons of refined sugar in place of the said forty-five hundred (4,500) tons that it had theretofore agreed to purchase from the plaintiff; that said defendant delivered to the said commission forty-five hundred (4,500) tons of refined sugar, and the said George M. Rolph, as head of the Sugar Division aforesaid, wrongfully approved the issuance of the export license therefor, and the said commission received the said sugar, and exported the same, and paid to the defendant therefor approximately the sum of one million one hundred thousand dollars ($1,100,000)."

Thereafter, on about September 20, 1918, the Norwegian Commission refused to receive any sugar from plaintiff under its contract, or to furnish shipping instructions, and informed plaintiff that the cause of its refusal was that it had already filled its contract and satisfied its requirements through defendant, and had received or would receive the 4,500 tons of sugar thereunder from defendant upon the representations aforesaid. Defendant represented to the Norwegian Commission that the United States government demanded that said sugar be sold at 11 cents per pound, and the commission believed said representations to be true, and agreed to pay and did pay to defendant 11 cents per pound for the 4,500 tons of sugar delivered to the commission by defendant. "Each and all of the aforesaid acts of the defendant were pursuant to and in execution of the wrongful design and contrivance aforesaid, to the injury of the plaintiff and to its damage in excess of two hundred and nineteen thousand dollars ($219,000)."

The net profit on the sale by defendant to the Norwegian Commission amounted to $219,744, "which said sum was in the month of September or October, 1918, had and received by the defendant to and for the use of the plaintiff, which in equity and good conscience the defendant should not retain." Plaintiff demands from defendant the sum of $219,744, "the money of the plaintiff so had and received by the defendant," but no part has been paid.

*Second Cause of Action.*—This sets forth the history of the transactions as alleged in the first cause of action and then continues as hereinafter stated. While Rolph, as head of the Sugar Division, continued to refuse to approve the issuance of a license for the exportation of the 4,500 tons, defendant by its officers, including Rolph, as president and one of its directors, wrongfully entered into the contract with the Norwegian Commission above described,

whereby defendant wrongfully agreed to sell to the commission, and the commission agreed to purchase from the defendant for export, at 11 cents per pound, the same quantity and quality of sugar which the commission had theretofore agreed to purchase from plaintiff, and defendant delivered to the commission the 4,500 tons of sugar contracted to be sold by it to the commission, and the said sugar was exported under a license issued with the wrongful approval of Rolph, as head of the Sugar Division, and the Norwegian Commission refused to accept the sugar contracted by it to be purchased from plaintiff. At the time defendant entered into the contract for the sale of the sugar to the Norwegian Commission, defendant knew that the commission required 4,500 tons of sugar to satisfy the needs of the Norwegian government, and that the commission had contracted to purchase the sugar from plaintiff, and was ready to carry out its contract as soon as Rolph, in his capacity as head of the Sugar Division, approved the issuance of a license for the exportation of the sugar.

Defendant knew, or should have known, that by entering into its wrongful contract with the commission and making delivery thereunder it wrongfully deprived plaintiff of the benefit of plaintiff's contract with the commission and the profits to be derived therefrom; and defendant knew that its president, Rolph, was, by virtue of the power vested in him as head of the Sugar Division, able to prevent and had continuously prevented the fulfillment of the contract between plaintiff and the commission by refusing to issue a license for the exportation of sugar thereunder. The act of Rolph in refusing to approve the issuance of a license for the exportation of the sugar contracted to be sold by plaintiff to the Norwegian Commission was contrary to law, in excess of any authority vested in Rolph, an abuse of the discretionary power vested in Rolph, and contrary to the purpose and intent of the acts of Congress, all of which was known to defendant at the time it negotiated and entered into its contract with the Norwegian Commission, and each and all of the acts of defendant were wrongful and to the injury and damage of plaintiff in excess of $219,000. The profit derived by defendant from the sugar it sold and delivered to the Norwegian Commission was $219,744, "which said sum was in or about the month of October, 1918, had and received by the defendant to and for the use of the plaintiff, which in equity and good conscience the defendant should not retain."

*Third Cause of Action.*—The allegations as to the facts are repeated. The complaint then continues:

On or about August and September, 1918, defendant, through its president, Rolph, or other officers and agents, with knowledge of the contract between plaintiff and the Norwegian Commission and wrongfully designing and contriving to deprive the plaintiff of the benefits of the contract to itself, wrongfully represented to the Norwegian Commission that no refined sugar could be exported from the United States, or any license for exportation of any sugar be issued, unless the sugar was purchased from or through defendant, and that the commission could not secure the 4,500 tons of sugar under its contract with plaintiff, except through defendant; that defendant further wrongfully represented to the commission that it had taken over all contracts for the sale of sugar for export from the United States to neutral countries, and that said defendant would fill all contracts for the sale of sugar on behalf of refiners who had made such. Defendant further wrongfully represented to the commission that, if the commission would take 4,500 tons of sugar from the defendant, said defendant could and would, through its president, Rolph, as head of the Sugar Division, secure the necessary export license, and defendant would and could fill the contract on behalf of plaintiff, and would deliver to the commission 4,500 tons of sugar on behalf and as agent of plaintiff at the price of 11 cents per pound.

Defendant wrongfully induced the commission to believe these representations, and to believe that in receiving the 4,500 tons of sugar from defendant the commission was fulfilling its contract with plaintiff, and the commission, relying thereon, agreed to take and did take and receive the 4,500 tons of sugar from defendant in fulfillment of its contract with plaintiff. Subsequently the commission refused to take any sugar from plaintiff under the

contract, and informed the plaintiff that it had satisfied its requirements through defendant. Each and all of the acts of defendant were pursuant to and in execution of "the wrongful design and contrivance aforesaid," to plaintiff's damage in excess of $219,000.

Defendant represented to the Norwegian Commission that · the United States government demanded that the sugar be sold at 11 cents per pound, and the commission believed the representation to be true, and paid this sum for the 4,500 tons of sugar delivered to the commission by the defendant. Defendant received as net profit on this sale to the Norwegian Commission the sum of $219,744, "which said sum of money was had and received by the defendant to and for the use of plaintiff, which in equity and good conscience the defendant should not retain."

*First Affirmative Defense.*—On or about August 10, 1917, pursuant to the provisions of the act of August 10, 1917, the President by executive order established the Food Administration, and appointed Hoover as Food Administrator. The Food Administrator was directed to supervise, direct, and carry into effect the provisions of the act, and the powers and authority therein given to the President, in so far as the same apply to foods, feeds, and their derivative products, and to any and all practices, procedures, and regulations authorized or required under the provisions of said act.

Thereafter as part of the machinery of the food control, and in order to enable the Food Administration more fully to carry out the regulation of the supply and distribution of sugar, upon the direction of the President on July 13, 1918, defendant was incorporated under the laws of Delaware, its entire capital stock of $5,000,000 being at all times thereafter owned by the United States of America; said stock having been paid for out of the appropriation of $50,000,000 authorized by the provision of the act of July 1, 1918. The certificate of incorporation of the defendant provided, as part of its objects and purposes: "To exercise all powers which may be delegated to it by the President of the United States." And upon the incorporation of the defendant said Hoover was elected a director and chairman of the board of directors thereof.

On or about August 27, 1917, under authority of statute, the President prohibited the exportation of sugar from the United States, except in accordance with regulations which required that a license therefor be first obtained in each case from the Export Administrative Board, and thereafter on or about October 12, 1917, by executive order, the President established the War Trade Board as the successor to the Export Administrative Board and vested in the War Trade Board all the power and authority of the Export Administrative Board, and from and after August 27, 1917, at all times mentioned in the complaint, it was settled policy of the Export Administrative Board and its successor, War Trade Board, to refuse all licenses for export of sugar from this country.

In or about September, 1918, upon the representations of the Norwegian minister of the urgent need of sugar in Norway, the Food Administrator directed defendant to sell and deliver 4,500 tons of sugar to the Norwegian Commission for export to Norway, and in obedience to said direction defendant thereupon sold and delivered in this country 4,500 tons to the Norwegian Commission, which was thereupon exported by them upon a license therefor duly issued by the War Trade Board, all of which was done under the authority and direction of the Food Administrator and the President of the United States in pursuance of lawful statute. The 4,500 tons of sugar sold as aforesaid are the 4,500 tons of sugar mentioned in the complaint as sold by defendant to the Norwegian Commission.

Said sale and delivery of the 4,500 tons of sugar was purely a governmental transaction between the United States through its Food Administration, and the government of Norway, through its Norwegian Commission, which said sale and delivery was arranged and carried out upon governmental orders and instructions through governmental agencies, and the act of the defendant in selling to the Norwegian Commission was an act of the Food Administrator representing the authority of the President of the United States, and it therefore was the act of the government of the United States.

*Second Affirmative Defense.*—This repeats the allegations down to that part relating to the representations of the Norwegian minister, and then phrases the allegations as hereinafter. In or about September, 1918, upon the representations of the Norwegian minister of the urgent need of sugar in Norway, the Food Administrator directed defendant to sell and deliver 4,500 tons of sugar to the Norwegian Commission for export to Norway, and in obedience to said direction defendant thereupon sold and delivered in this country to the Norwegian Government Food Commission 4,500 tons of sugar, which was thereupon exported by them upon a license therefor duly issued by the War Trade Board. The 4,500 tons of sugar sold as aforesaid are the 4,500 tons of sugar mentioned in the complaint herein as sold by defendant to the Norwegian Commission. All the profits, if any, which accrued to defendant through the said sale and delivery of 4,500 tons of sugar to the Norwegian Commission, have been received and are now owned by defendant as a part of its assets in common with all its other assets. The entire capital stock of defendant, since its incorporation, has been and is now owned solely by the government of the United States of America, and all the assets of defendant are the sole property of the government of the United States of America.

*Third Affirmative Defense.*—Pursuant to the provisions of the Food and Fuel Act, approved August 10, 1917, the President by executive order established the Food Administration, and Hoover was therein designated Food administrator. On July 13, 1918, defendant was organized and incorporated under the laws of Delaware, upon the direction of the President, as a part of the machinery of the food control, to act as a subordinate officer or agent of the Food Administration, in obedience to the orders, direction, and control of the Food Administrator. In or about September, 1918, the Food Administrator, by an order purporting in every way to be within the powers conferred upon him by law, and to be validly and fairly issued, directed defendant to sell and deliver in this country to the Norwegian Commission 4,500 tons of sugar, and in obedience to said order, as required of it by law, defendant thereupon sold and delivered in this country said 4,500 tons of sugar to the Norwegian Commission. Said 4,500 tons of sugar sold as aforesaid are the 4,500 tons of sugar mentioned in the complaint herein as sold by defendant to the Norwegian Commission.

Bigelow & Wise, of New York City (Lindley M. Garrison, Ernest A. Bigelow, and Charles A. Boston, all of New York City, of counsel), for plaintiff.

Shattuck, Glenn, Huse & Ganter, of New York City (William A. Glasgow, Jr., of Philadelphia, Pa., and Edwin P. Shattuck and Garrard Glenn, both of New York City, of counsel), for defendant.

MAYER, District Judge. (after stating the facts as above). [1] It is, of course, elementary that a demurrer searches the complaint, and therefore it becomes necessary at the outset to determine whether the complaint states one or more causes of action. So far as language goes, it is plain that the complaint is framed upon the theory that the facts set forth causes of action upon an implied promise upon the count for money had and received, which in equity and good conscience defendant should not retain and should pay to plaintiff. It will be unnecessary to determine whether the allegations of the complaint set forth causes of action upon any other theory, if the implied promise theory is sound. The three causes of action, all moving to the same end, are differentiated by plaintiff as follows:

"The second difference between the allegations of the first and second causes of action is that in the first the basis is the wrongful inducement of a contract with the plaintiff's vendee, and in the second the wrongful entry into a con-

tract with the plaintiff's vendee with full knowledge of the facts, in both utilizing the wrongful activity of the defendant's president. The second cause of action suggests, under the circumstances alleged, the violation of a duty on the part of the defendant, with knowledge of the facts alleged, to abstain from preventing the vendee carrying out its contract with the plaintiff. The third cause of action alleged is based upon the same elementary facts, which are reiterated; but it is also alleged that the defendant, with knowledge of these facts, and a wrongful design to deprive the plaintiff of the benefit of its contract with its vendee, not only made the wrongful representations that no sugar could be exported unless purchased through the defendant, but further that the defendant had taken over all contracts, and the defendant would fill the plaintiff's contract, and the defendant would secure a license for export and fill the said contract on behalf of the plaintiff, and that the defendant induced the belief on the part of the vendee that the defendant was fulfilling the plaintiff's contract, and relying thereon the vendee refused to complete with the plaintiff, and the plaintiff received no profit therefrom. Thus the third cause of action presents the additional element of estoppel, in that defendant actually represented and induced the belief on the part of the vendee that defendant was fulfilling the plaintiff's contract."

The law of quasi contracts, so called, has as one of its vital features the aim of the courts to apply a suitable remedy for the results flowing from certain kinds of wrongs. Thus it is that an action, in some circumstances, will be regarded as ex contractu, even though there has not been agreement between the parties. The broad principle is succinctly stated in 13 C. J. 244, as follows:

"Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law, without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on a legal fiction, and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. * * * Among the instances of quasi or constructive contracts may be mentioned cases in which one person has received money which another person ought to have received, and which the latter is allowed to recover from the former in an action of assumpsit for money had and received, or money received to the use of plaintiff. * * *"

See, also, Miller v. Schloss, 218 N. Y. 400, at page 407 et seq., 113 N. E. 337.

The implied promise springs up by virtue of or follows the commission of a wrong. In each of the causes of action here a wrong is alleged. In the first and third causes of action, the wrong alleged is clearly of the kind discussed in Angle v. Chicago, St. Paul, etc., Railway, 151 U. S. 1, at page 13 et seq., 14 Sup. Ct. 240, 38 L. Ed. 55, and American Malting Co. v. Keitel, 209 Fed. 351, at page 358 et seq., 126 C. C. A. 277. In the second cause of action the wrong alleged is the failure to abstain from preventing the Norwegian Commission from carrying out its contract with plaintiff, when its duty was so to abstain.

Of course, the wrong must have been the proximate cause of failure of the Norwegian Commission to perform its contract, else plaintiff has no case; and it is earnestly contended by defendant that its conduct as alleged was not such cause. I am unable to follow this contention. As the three causes of action are drawn, they plainly attribute the fail-

ure of the Norwegian Commission to carry out its contract with plaintiff to the acts of defendant; the first and third by active representations, and the second by failing in violation of duty, to abstain from preventing performance by the Norwegian Commission. Had the complaint merely alleged the refusal of Rolph, as head of the Sugar Division, to issue an export license, and then an independent agreement between defendant and the vendee, without representations or without violation of duty, the case, of course, would have been different. Nor does the fact that the export license was refused prior to the defendant's incorporation alter the matter, because plaintiff relies, not only on that fact, but necessarily also upon the facts alleged to have occurred subsequent thereto.

A further contention of defendant, earnestly urged, is based on the expressions of Keener and Woodward in their works on Quasi Contracts. Woodward, Quasi Contracts, § 274, referring in part to Keener, says:

"Perhaps it was arguable at one time that the obligation of a tort-feasor in assumpsit is analogous to that of a constructive trustee, and that he should be held accountable for any profits derived by him from his wrongful act. It seems to be now taken for granted, however, that the obligation is not to account for profits but to make restitution. It follows that it is not enough that the defendant has been enriched by his wrong; it must further appear that the benefit received by defendant has been taken from the plaintiff. As Prof. Keener puts it, there must be 'not only a plus but a minus quantity.'"

Plaintiff's counsel analyze these propositions of the writers, and, finding that Keener's reference (followed by Woodward) is to one English case, Phillips v. Homfray, L. R. Ch. Div. 439, they dissect that case to ascertain the real point decided. But, laying aside the case referred to, the principle announced is illogical in its limitations. The point is not whether a definite something was taken away from plaintiff and added to the treasury of defendant. The point is whether defendant unjustly enriched itself by doing a wrong to plaintiff in such manner and in such circumstances that in equity and good conscience defendant should not be permitted to retain that by which it has been enriched.[1]

The whole trend of the law points to the aspiration of the courts to find an adequate and orderly remedy for wrongs as to which redress was elusive until this theory of quasi contracts was developed. Mr. Justice Brewer, early in the Angle Case, said:

"Surely it would seem the recital of these facts would carry with it an assurance that there was some remedy, * * * and that such remedy would reach to the party * * * by whose acts these losses were caused."

Judge Collin, in Miller v. Schloss, supra, speaks of natural equity and good conscience, and of the circumstances under which money ex æquo et bono belongs to another. Indeed, this is one of those develop-

---

[1] "Unjust enrichment" is now a familiar expression used to describe a result in different relations and in differing forms of litigation. Schall v. Camors, 251 U. S. 239, 40 Sup. Ct. 135, 64 L. Ed. 247; Eastern Extension Co. v. United States, 251 U. S. 355, 40 Sup. Ct. 168, 64 L. Ed. 305; Miller v. Schloss, supra; Matter of Wilson (D. C.) 252 Fed. 631.

ments of the law where the courts have shown themselves keen to avoid refinements in their efforts to reach sound and practicable remedies, and their goal has been the remedy. The correct principle, as it seems to me, is well stated in a recent note in the Columbia Law Review of May, 1920, at page 602:

"The most that can be said is that ordinarily, and apart from some rule of policy which dictates the contrary result, recovery should be allowed where there has been actual enrichment at the plaintiff's expense. * * * "

In the case at bar it might further be contended, not without merit, that the case comes even within the limitations stated by Keener and Woodward; but I prefer to rest my conclusion on the broader ground.

It is further urged that, unless plaintiff has been actually damaged, it has no grievance, and that the complaint should have alleged ability profitably to perform plaintiff's contract with the Norwegian Commission. This position misconceives the nature of an action for money had and received as framed in this complaint. Whether inability to perform is a defense need not now be determined. The action is not for damages for breach of contract, but for the profit which defendant is alleged to have made as the result of its alleged wrongful acts. Ability to perform, in such circumstances, is no part of plaintiff's case. Angle Case, supra, 151 U. S. 12, 14 Sup. Ct. 240, 38 L. Ed. 55.

In any event, at any time prior to October 1, 1918, the date to which the performance of plaintiff's contract had been extended, the necessary license might have been obtained. It was within Rolph's power to grant the license before October 1st; but prior thereto (i. e., on September 20th) the Norwegian Commission notified plaintiff that it would not take the sugar from plaintiff, because defendant had filled its requirements. In other words, defendants' alleged tort having been committed prior to October 1st (i. e., prior to September 20th), ability of plaintiff to perform after September 20th becomes immaterial as a necessary requirement of plaintiff's causes of action.

Finally, in respect of the third cause of action, there is neither a question of estoppel nor a question of ratification. Its allegations are not of the kind where a principal ratifies the unauthorized acts of an agent in order to avail of the benefits of those acts. In principle this cause is like the first cause of action, in that it alleges misrepresentations which induced the breach of the contract between plaintiff and the Norwegian Commission.

For the reasons thus outlined, I am of opinion that the complaint is not demurrable.[2]

*Demurrer to Defenses.*—At the outset, it is apparent that the transactions described in the defenses were not transactions between the goverments of the United States and Norway. Such international transactions, if in pursuance of treaty powers, must have the constitutional consent of the Senate. Any other international transaction,

---

[2] It is, of course, not practicable to discuss all the points, such as the claimed analogy with infringement suits. They have received consideration, but only the more important features of the controversy have been stated.

even under the war power, must find its authority in statute. No such authority is found in this case.

[2] The defenses rest principally upon the proposition that the defendant was an agent of the sovereign, and that an action against the agent is in effect an action against the sovereign, and that the sovereign cannot be sued without its consent. The Executive, under the Act of August 10, 1917, could have used plaintiff, a New York corporation, as its distributing agent, and as a necessary consequence of defendant's contention, if, in distributing sugar, it had injured some person, then the person so injured could not have sued this plaintiff without the consent of the United States.

Before such and similar results can be justified, it must be clear, both on reason and authority, that, where the corporation used as an agency is created and organized under a state statute, it may be relieved of all the responsibilities usually attached to it. Section 2 of the Act of August 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ee), provided:

"Sec. 2. That in carrying out the purposes of this act the President is authorized to enter into any voluntary arrangements or agreements, to create and use any agency or agencies, to accept the services of any person without compensation, to co-operate with any agency or person, to utilize any department or agency of the government, and to co-ordinate their activities so as to avoid any preventable loss or duplication of effort or funds."

The agency here concerned is a Delaware corporation. Nothing in section 2, supra, purports to change (if there were power so to do) the rights, duties, obligations, and liabilities of such a corporation. The Congress did not enact any statute incorporating the defendant or specifically providing for its incorporation. Its incorporation was under the laws of Delaware, and the Revised Code of Delaware of 1915 (chapter 65, § 1916) provides:

"Sec. 2. *Powers.*—Every corporation created under the provisions of this chapter shall have power. * * *

"2. To sue and be sued, complain and defend in any court of law or equity. * * *

"8. To conduct business in this state, other states, the District of Columbia, the territories and colonies of the United States and in foreign countries. * * *"

If the sovereign thus chooses as its agent a state corporation which can be sued it cannot by ipse dixit deprive one injured by such an agent of the right to sue. The state of Delaware allowed defendant to be created, but as a condition of its creation and existence it afforded the right to any one to sue the corporate being which it thus created. It is alleged that, upon "the direction" of the President, defendant was incorporated. This is but another way of saying that the President directed that the necessary number of persons required under the Delaware statute should take the steps necessary under that statute to incorporate a defendant subject to the liabilities of that statute. Neither the Executive nor any person acting with authority under him had the power to change the Delaware statute, and hence no power to change the obligations, rights, or liabilities of a corporation which was

the creature of the statute; i. e., the creature of the sovereign state of Delaware.

If Ballaine v. Alaska Northern Ry. Co., 259 Fed. 183, 170 C. C. A. 251, is to be deemed an authority, it must be on the special facts of that case. The mere fact that the United States was a stockholder in the Alaska Railway is not enough. Bank of the U. S. v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244; Panama Ry. Co. v. Curran, 256 Fed. 768, 168 C. C. A. 114; Salas v. United States, 234 Fed. 842, 148 C. C. A. 440. In the Ballaine Case certain express powers were conferred upon the President with reference to the acquisition of railroads in a territory, and the court held that by virtue of the act of Congress, taking its provisions together, the United States acted in its sovereign capacity in acquiring the stocks, bonds, and property of the railway, and employed the corporate organization as an agency through which to execute the purposes of the statute.

By citing Luxton v. North River Bridge Co., 153 U. S. 525, 14 Sup. Ct. 891, 38 L. Ed. 808, it is apparent that the court regarded the Alaska Railway as owned as a direct governmental agency to carry out a governmental purpose in the territory. But in the Ballaine Case the court was not called upon to determine whether the laws of a state may be regarded as inoperative and inapplicable merely because a corporation of the state is used as a governmental agency. See Gould Coupler Co. v. U. S. Shipping Board Emergency Fleet Corporation (D. C.) 261 Fed. 716, which, though somewhat different from the case at bar, expresses the reluctance of the courts to extend the doctrine of immunity beyond limits clearly defined.

[3] But it is alleged that, pursuant to an order from the Food Administrator, "purporting * * * to be within the powers conferred upon him by law," defendant was directed to sell the sugar. If this is anything more than a conclusion of law, then in any event it is no defense to the commission of a tort. The complete answer is that neither the Executive nor the Food Administrator had the power (even if it had been alleged that they sought to exercise it) to order the defendant to do a wrong.

[4] Finally, it is urged that the second affirmative defense must be good, because all the profits derived from the transaction are owned by defendant as part of its assets, and all the assets of defendant are the sole property of the United States by virtue of its ownership of the entire stock of defendant. Here again the Ballaine Case, supra, is referred to in support of the proposition thus advanced. Citing cases, the learned judge in that opinion points out that the Supreme Court held that "Congress could create corporations as appropriate means of executing the powers of government."

In the case at bar the Congress did not create the corporation. In the Ballaine Case it was stated that the United States, acting in its sovereign capacity, "merely employed the corporation as an agency through which to execute the purposes of the statute"; but the court necessarily held that the purpose of the statute and its execution were not commercial, and pointed out that the Alaska Railway was acquired for the settlement of public lands and other governmental purposes.

The commercial nature, if any, of the business in that regard, was an incident, and the case turned on the character of the agency, while the ownership by the government of bonds was immaterial, as is emphasized by the court's reference to Salas v. United States, 234 Fed. 842, 148 C. C. A. 440. In the latter case it appeared that the United States owned all of the stock of the Panama Railroad Company, but because the Panama Company had entered into a commercial business the conspiracy complained of was held not to be against the United States. Panama Ry. Co. v. Curran, 256 Fed. 768, 168 C. C. A. 114; Commercial Cable Co. v. Philippine National Bk. (D. C.) 263 Fed. 218.

In the case at bar it is also claimed by defendant that the profit was an incident foreign to the performance of defendant's duty and the purposes of its incorporation. But the incorporation under a state statute of a business corporation cannot deprive the agent thus created of its right as a corporation to make a profit nor relieve it of its corporate liabilities. It may be, as was held in the Panama and Commercial Cable Co. Cases, supra, that when the government itself creates its own agent, and owns part or all of the stock of the agent thus created, the test as to whether the corporation is suable, or whether the agent is a department of government, is the nature of the business done; but when the sovereign uses an agency created, not by itself, but under a state statute, he takes his agent as he finds it.

No case has been nor can be cited which authorized the President of the United States to change a state statute, or the powers conferred thereby, or the liabilities necessarily flowing therefrom. The property of the corporation cannot become the property of the stockholders until all provable claims are liquidated, no matter what the purpose of the stockholder may be, and the government's position as a stockholder is no different from that of a sovereign state which is a stockholder. As was said by the Chief Justice in Bank of U. S. v. Planters' Bank of Georgia, supra:

"The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation, than are expressly given by the incorporating act. The government of the Union held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank in the sense of the Constitution. So with respect to the present bank. Suits brought by or against it are not understood to be brought by or against the United States. The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter."

Here the case, if anything, is not so strong. The United States is not an incorporator, but a stockholder in a corporation, which, as a condition or necessary accompaniment of its existence, can be sued and can engage in business. In enacting the statutes, supra, Congress intended, inter alia, to conserve necessaries during the war, and therefore, conferring large and almost unlimited powers to select agencies

to that end, it is fair to assume that the Congress realized that it might be necessary to engage in commercial transactions. The very incorporation of defendant demonstrates that the ordinary methods of transacting business by executive departments were inadequate, and doubtless subject to embarrassment by a maze of unworkable statutes and regulations, and that the elastic powers of a business corporation would enable the purchase and sale of sugar to be engaged in with the same facility as such transactions ordinarily go forward at the hands of individuals or business corporations. Such an incorporation was undoubtedly a practical and helpful instrumentality for doing the work with which the government was confronted; but it is repugnant to the American theory of sovereignty that an instrumentality of the sovereign shall have all the rights and advantages of a trading corporation, and the ability to sue, and yet be itself immune from suit, and be able to contract with others, or to injure others, confident that no redress may be had against it as matter of right, but only, if at all, as matter of the favor of the sovereign.

There is not even in this case the creation of a corporation by act of Congress nor an express direction to incorporate, such as is found in the Shipping Act (Comp. St. §§ 8146a–8146r). Gould Coupler Co. Case, supra. But here the Executive, in pursuance of the discretion vested in him, chose an agent which by its very nature and existence had the right to engage in a commercial business. The whole tendency is against the extension of the immunity of the sovereign as against proper suitors, as is evidenced by such legislation as the Tucker Act (24 Stat. 505) and the Shipping Act (construed in certain respects in The Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962), and by cases such as are cited supra. This is not a case which invites a step in the opposite direction.

The demurrer to each and all of the affirmative defenses is sustained.