# THE LAKE MONROE.[1]

### ON PETITION FOR WRITS OF PROHIBITION OR MANDAMUS.

No. 30, Original.  Argued April 21, 22, 1919.—Decided June 2, 1919.

Under the Act of June 15, 1917, c. 29, 40 Stat. 182, empowering the President, *inter alia,* to requisition private shipping for use and operation by the United States, permitting the exercise of the power through such agencies as he may determine, and providing that ships so requisitioned shall be managed, operated and disposed of as he may direct; and under the President's order of July 11, 1917, delegating those powers for exercise by the Shipping Board and Emergency Fleet Corporation, a ship in course of construction was requisitioned and completed by the Corporation, documented in the name of the United States, and operated by the Board through the Corporation and a private firm, who, as managing and operating agents of the Board, chartered her to a private company for the coastwise carriage of a private cargo of coal. While so engaged a collision occurred, and the vessel was libeled in the District Court. *Held,* that the District Court had jurisdiction to arrest the vessel, under § 9 of the Shipping Board Act of September 7, 1916, c. 451, 39 Stat. 728, providing that vessels purchased, chartered, or leased by the Board, "while em-

---

[1] The docket title of this case is: *Ex parte: In the Matter of the United States, Petitioner.*

ployed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein," which provision was re-enacted by the Act of July 15, 1918, c. 152, 40 Stat. 900, amending the Shipping Board Act. P. 253.

It is not to be assumed that Congress intended that the power given by the Act of June 15, 1917, *supra*, should be exercised by the President arbitrarily or that the President by his order intended to vest absolute powers in the Shipping Board and Fleet Corporation, subject only to such regulations as he might from time to time prescribe. *Id.*

On the contrary, in view of the establishment of the Board and the Corporation as government agencies, broadly empowered and definitely restricted under the Shipping Act, and of the mention of that act in the Act of June 15, 1917, *supra*, it is to be presumed that Congress at least expected that those agencies would be used under the latter act, and that the President, in employing them thereunder, did so because of those powers and restrictions, already provided. *Id.*

This view is confirmed by the Act of July 15, 1918, *supra*, and the companion measure of July 18, 1918, c. 157, 40 Stat. 913, read with the House and Senate reports accompanying the bills. P. 255.

The words "purchased, chartered, or leased," in § 9, *supra*, of the Shipping Act, cover a contract for the temporary use of a vessel or its services not amounting to a demise, "charter" being employed here in a sense as broad as the definition in the Act of July 18, 1918, *supra*, defining it as "any agreement, contract, lease, or commitment by which the possession or services of a vessel are secured for a period of time, or for one or more voyages, whether or not a demise of the vessel." *Id.*

Construing § 9 of the Shipping Act as a whole, the vessel in this case was employed "solely as a merchant vessel," though assigned to the New England coal trade when the Government was rationing the coal supply of the country as a war measure. P. 256.

Order to show cause discharged.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Brown*, with whom *Mr. Chas. H. Weston* and *Mr. J. Frank Staley* were on the brief, for the United States.

*Mr. Edward E. Blodgett,* with whom *Mr. Foye M. Murphy* and *Mr. Albert T. Gould* were on the brief, for respondent.

MR. JUSTICE PITNEY delivered the opinion of the court.

Upon petition of the United States this court granted an order to show cause why a writ of prohibition or mandamus should not be issued in order to prevent the United States District Court for the District of Massachusetts, sitting in admiralty, from directing the seizure, attachment, or arrest of a steam vessel known as the *Lake Monroe,* owned and operated by the Government of the United States, to satisfy a claim of the master and part owner of the American auxiliary fishing schooner *Helena* for damages arising out of a collision between the two vessels which occurred on October 8, 1918, off the coast of Cape Cod.

A libel having been filed in the District Court in behalf of the *Helena* against the *Lake Monroe* to recover damages, and praying that process issue for the seizure and attachment of the steamship, the United States, appearing specially, filed suggestions to the effect that, as the steamer was the property of the United States and in its possession and control, the court was without jurisdiction to enforce claims against her by process.

The essential facts are as follows: The *Lake Monroe,* while in process of construction on the Great Lakes, was requisitioned and completed by the United States Shipping Board Emergency Fleet Corporation, and on completion was delivered to the United States Shipping Board for operation, and thereafter assigned by that board, through the Emergency Fleet Corporation, to the firm of William H. Randall & Company, of Boston, as operating and managing agents, that firm being a copartnership having experience in the operation of privately owned vessels for

commercial purposes. They selected the master and other officers of the vessel, put them in charge of her, and furnished her crew; and thereafter they manned, equipped, and repaired her, collected freight moneys from the consignees, and paid the expenses of manning, equipping, and supplying her, and other running expenses, and for these services they were to be paid by, and were to account for the moneys received by them to, the Emergency Fleet Corporation as the agent of the United States Shipping Board. At the time of the collision the *Lake Monroe* was loaded with coal, and operating under a charter executed by Randall & Company, as agents of the Shipping Board, to the New England Fuel & Transportation Company, a private concern in Boston; the cargo having been purchased from a private owner for private use, and the freight for its carriage paid by the Transportation Company to Randall & Company.

The District Court, conceding that the *Lake Monroe*, being a government-owned vessel, would be exempt from arrest except for the provisions of § 9 of the Shipping Board Act of September 7, 1916, c. 451, 39 Stat. 728, 730, held that, because at the time of the collision she was employed solely as a merchant vessel, by the terms of that section she was subject to arrest on process *in rem* to answer for the collision.

It is the principal contention of the Government that the Shipping Board Act has no application to the *Lake Monroe* because she was requisitioned by the President through the Emergency Fleet Corporation under the authority of other legislation, was documented in the name of the United States, and then employed by the President through the Shipping Board and the Fleet Corporation. This contention renders it necessary to review the several acts of legislation and the executive action that has been had pursuant thereto.

The Act of September 7, 1916, passed before the United

States entered the great war but when our commerce already was feeling the ill effects of the world wide shortage in shipping occasioned by that war, is entitled "An Act To establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign and interstate commerce of the United States; and for other purposes." It created a board of five commissioners, and authorized them (§ 5) with the approval of the President, to cause to be constructed and equipped, in American shipyards or elsewhere, or to purchase, lease, or charter "vessels suitable, as far as the commercial requirements of the marine trade of the United States may permit, for use as naval auxiliaries or Army transports, or for other naval or military purposes," and also (§ 7) to charter, lease, or sell to any citizen of the United States, any vessel so purchased or constructed.

The important § 9, in its original form, provided as follows: "Sec. 9. That any vessel purchased, chartered, or leased from the board may be registered or enrolled and licensed, or both registered and enrolled and licensed, as a vessel of the United States and entitled to the benefits and privileges appertaining thereto: *Provided,* That foreign-built vessels admitted to American registry or enrollment and license under this Act, and vessels owned, chartered, or leased by any corporation in which the United States is a stockholder, and vessels sold, leased, or chartered to any person a citizen of the United States, as provided in this Act, may engage in the coastwise trade of the United States. Every vessel purchased, chartered, or leased from the board shall, unless otherwise authorized by the board, be operated only under such registry or enrollment and license. *Such vessels while employed solely*

*as merchant vessels shall be subject to all laws, regulations,
and liabilities governing merchant vessels, whether the United
States be interested therein as owner, in whole or in part, or
hold any mortgage, lien, or other interest therein."* There
followed prohibitions not necessary now to be particularly
considered.

Section 11 authorized the Shipping Board to form one
or more corporations under the laws of the District of
Columbia for the purchase, construction, equipment,
lease, charter, maintenance, and operation of merchant
vessels in the commerce of the United States, the total
capital stock not to exceed $50,000,000, and the Board to
acquire for and on behalf of the United States not less than
a majority of the capital stock. The act contained nu-
merous provisions imposing duties upon common carriers
by water, and conferring powers of regulation upon the
Shipping Board.

The members of this Board were appointed by the
President in December, 1916, and, having been confirmed
by the Senate, were formally organized in the following
month.

By the time the United States declared war, April 6,
1917, the world's merchant shipping had reached the
stage of demoralization. The President, by a proclama-
tion dated February 5, 1917, had declared an emergency,
and brought into play the prohibition of one of the clauses
of § 9 of the above act, against the sale, lease, or charter
to a person not a citizen of the United States or the trans-
fer to a foreign registry or flag of any vessel registered or
enrolled and licensed under the laws of the United States.

Soon after the declaration of war the Shipping Board,
under authority of § 11 of the above act, caused to be
organized (April 16, 1917) under the laws of the District
of Columbia a corporation known as the United States
Shipping Board Emergency Fleet Corporation, with
$50,000,000 of capital stock, all owned by the United

States. It was officered by the commissioners of the Shipping Board and their nominees, and was but an operating agency of that Board.

In this state of affairs, Congress embodied in the Urgent Deficiencies Appropriation Act of June 15, 1917, c. 29, 40 Stat. 182, a clause entitled "Emergency Shipping Fund," which conferred upon the President broad powers of control over contracts for the building, production, or purchase of ships or material, and among others the power "To purchase, requisition, or take over the title to, or the possession of, for use or operation by the United States any ship now constructed or in the process of construction or hereafter constructed, or any part thereof, or charter of such ship." Another clause declared: "The President may exercise the power and authority hereby vested in him . . . through such agency or agencies as he shall determine from time to time: *Provided*, That all money turned over to the United States Shipping Board Emergency Fleet Corporation may be expended as other moneys of said corporation are now expended. All ships constructed, purchased, or requisitioned under authority herein, or heretofore or hereafter acquired by the United States, shall be managed, operated, and disposed of as the President may direct."

Under this authority the President made an executive order July 11, 1917, directing that the Fleet Corporation should have and exercise all power and authority vested in him by said provision, so far as applicable to the construction of vessels, the purchase or requisitioning of vessels in process of construction, and the completion thereof, and that the Shipping Board should exercise all power and authority vested in him by said provision, so far as applicable to the taking over of title or possession, by purchase or requisition, of constructed vessels or charters therein, and the operation, management and disposition of such vessels, and of all others theretofore or there-

after acquired by the United States, declaring: "The powers herein delegated to the United States Shipping Board may, in the discretion of said Board, be exercised directly by the said Board or by it through the United States Shipping Board Emergency Fleet Corporation, or through any other corporation organized by it for such purpose." It was under the authority thus conferred that the *Lake Monroe* was requisitioned while in process of construction and carried to completion by the Fleet Corporation, and thereafter operated by the Shipping Board through that corporation. She was documented in the name of the United States, and assigned to Randall & Company as operating and managing agents, and at the time of the collision was operating under a charter executed by them as agents of the Shipping Board to a private concern for carrying coal in coastwise commerce.

Reference should be made to two acts, approved respectively July 15 and July 18, 1918, the former an amendment to the Shipping Act of 1916, the latter "An Act to confer on the President power to prescribe charter rates and freight rates and to requisition vessels, and for other purposes." (Cc. 152 and 157, 40 Stat. 900, 913). They were introduced as companion measures, the former as H. R. 12,100, the latter as H. R. 12,099, and proceeded *pari passu* through Congress. The Act of July 15 amended § 9 of the Shipping Act of 1916 with respect to some of its prohibitions, but reënacted almost *verbatim* the part we have quoted from that section. The Act of July 18 begins with some definitions, and among them: "The term 'charter' means any agreement, contract, lease, or commitment by which the possession or services of a vessel are secured for a period of time, or for one or more voyages, whether or not a demise of the vessel."

In view of this legislation we regard the contention of the Government that the Shipping Act of 1916 has no application to the *Lake Monroe* as untenable. The argu-

ment adduced in support of it would cause the restrictive provisions of the Act of 1916 to operate only with respect to vessels constructed or acquired under that particular act and would render the powers conferred upon the Shipping Board and the Fleet Corporation by the executive order of July 11, 1917, absolute powers, subject to no regulation except such as the President might from time to time prescribe.

But at the time of the emergency provision of June 15, 1917, the Shipping Board had been established as a public commission, with broad administrative powers and subject to definite restrictions, and the Fleet Corporation had been created as its agency, financed with public funds. The emergency shipping legislation evidently was enacted in the expectation that the President would employ the Shipping Board and the Fleet Corporation as his agencies to exercise the new powers, for the Fleet Corporation was mentioned in the act, and it was known to be but an arm of the Board. It is not necessary to hold that Congress, while entertaining this expectation, went to the extent of restricting the President to those agencies; but it is not to be believed that they intended he should exercise the powers arbitrarily. And when in fact he designated the Fleet Corporation to exercise those powers so far as they pertained to the construction of vessels and the requisitioning of vessels in process of construction, and the Shipping Board so far as they applied to the operation, management, and disposition of vessels, it is to be presumed that he did so because of the general powers that already had been conferred upon them by law, and because they were subject to the regulatory provisions that Congress had enacted.

The provision of § 9 of the Act of September 7, 1916, that vessels purchased, chartered, or leased from the Shipping Board, while employed solely as merchant vessels, should be subject to all laws, regulations, and liabili-

ties governing merchant vessels, whether the United States were interested therein as owner or otherwise, was a most material restriction, deemed by Congress to be essential to subject them to the same duties and liabilities as privately owned merchant vessels with which they competed.

. That Congress considered this provision and the other provisions of the Act of 1916 as having living force and general application after the executive order of July 11, 1917, is manifest from the amendatory Act approved July 15, 1918, while the war was at its height, and treated by Congress as an emergency war measure. See House Rep. 568 and Senate Rep. 536, 65th Cong., 2d sess.; also House Rep. 569 and Senate Rep. 535, same session, relating to the companion measure. These reports and the accompanying bills show that the Shipping Board was understood to be executing all its powers under the regulations prescribed by the Act of 1916.

The Government contends further that § 9 of that act has no application to the present case because liability is imposed thereby only with respect to vessels "purchased, chartered, or leased from" the Shipping Board, and only when "employed solely as merchant vessels"; it being insisted that the *Lake Monroe* does not come within either of these descriptions. The return however, makes it clear that at the time of the collision she was operating under a charter executed by the agents of the Board to a certain coal company; and even were it merely an agreement whereby the shippers paid a stipulated rate per ton for the cargo carried, we think that this would be a charter within the meaning of the Act of 1916. The words "purchased, chartered, or leased" indicate an intent to include a contract for the temporary use of a vessel or its services, not amounting to a demise of the ship; in short, the term "charter" was here employed in a sense as broad as the definition afterwards embodied in the Act of July 18, 1918.

We cannot accede to the suggestion that the *Lake Mon-*

roe was not employed "solely as a merchant vessel" because she was assigned to the New England coal trade, and because at that time the Government, through the Fuel Administration, was rationing the coal supply of the country. The language of § 9 "such vessels while employed solely as merchant vessels" must be read in connection with the phrase "whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein." Her service at the time was purely commercial, and she was subject by the terms of the act to the ordinary liability of a merchant vessel, notwithstanding the indirect interest of the Government in the outcome of her voyage.

We deem it clear, also, that among the liabilities designated by the section is the liability of a merchant vessel to be subjected to judicial process in admiralty for the consequences of a collision.

*Order to show cause discharged and petition dismissed.*