### THE MINNESOTA, and four other cases.

District Court, E. D. Louisiana.    June 14, 1927.

Nos. 16653, 16765–16767, 16783.

1. **Maritime liens** ⚖︎⇒56—Supplies furnished to purchaser of vessel from Shipping Board held not to give right of action against United States (Suits in Admiralty Act, § 2 [Comp. St. § 1251¼a]).

Where a vessel sold by the Shipping Board on conditional contract with preferred mortgage back was in possession of crew and master employed by purchaser, on whose order supplies were furnished without inquiry as to ownership, the furnishers, even conceding that, because the act of sale had not then been recorded in the customhouse or on the ship's papers, they might be entitled to a lien, cannot maintain a suit in personam against the United States under Suits in Admiralty Act, § 2 (Comp. St. § 1251¼a); their right of action in personam being against the actual owner in possession.

2. **Admiralty** ⚖︎⇒26—Suits In Admiralty Act merely substitutes remedy in personam against United States for one in rem (Suits in Admiralty Act, §§ 1, 2 [Comp. St. §§ 1251¼, 1251¼a]).

Suits in Admiralty Act, §§ 1, 2 (Comp. St. §§ 1251¼, 1251¼a), merely substitutes a remedy in personam upon in rem principles, for a remedy in rem against the vessel, when owned by the government, and no more personal liability attaches to the United States, as owner, than would attach to a private owner.

In Admiralty. Suit by the New Orleans Ship Chandlery Company, Inc., against the American steamship Minnesota; also suits by R. J. Lewis, by Joseph M. Clark and John I. Clark, doing business as Joseph M. Clark & Bro., by S. T. Ford & Co., Inc., and by the Ft. Dearborn Coal & Export Co., Inc., against the United States and the United States Shipping Board Emergency Fleet Corporation, consolidated for trial. Libels in personam dismissed.

Richard B. Montgomery, Jr., of New Orleans, La., for libelants Lewis and others.

Edouard F. Henriques, Sp. Asst. U. S. Atty., in Admiralty, of New Orleans, La., for defendants.

BURNS, District Judge. The American steamship Minnesota was sold under a conditional agreement of sale by the United States, through the United States Shipping Board Emergency Fleet Corporation, December 11, 1920, on which date it was formally delivered to the purchaser, one George S. Bennett, of New Bern, N. C., through his agent at Norfolk, Va., one Capt. R. J. Lewis, whom he appointed master of the vessel. She was manned by a crew of some 70 men at Norfolk preparatory to a voyage to Houston, Tex., whence she was to sail in foreign trade.

Though the bill of sale was dated December 11, 1920, it was in fact signed by the Shipping Board Emergency Fleet Corporation on December 27, and by Bennett on January 8, 1921, on which date the latter executed a preferred mortgage, identified with the sale, for the balance of the purchase price, amounting to $112,500. Among the conditions was a clause providing that the mortgagor "should not suffer or permit any lien or charge having priority or preference over the lien of the mortgage upon the vessel." This sale and mortgage was not recorded in the custom house at New Bern, N. C., however, until January 17, 1921, nor indorsed upon the ship's papers until April 7, 1921.

Meanwhile, between December 11, 1920, and January 9, 1921, when she left Norfolk for Houston, the master bought provisions and supplies at Norfolk. He used money furnished by Bennett in payment of the supply people, but left a number of bills at Norfolk unpaid, particularly those of the libelants, who originally filed their libels at Norfolk, Va., in April and May, 1921—Ft. Dearborn Coal & Export Company, Inc., for coal, $3,011; Joseph M. Clark & Bro., for supplies, $266; S. T. Ford & Co., Inc., for supplies, $2,045.83; Freeman Nautical Company, for repairs, $65.

On January 29, 1921, the ship was picked up with her captain, R. J. Lewis, and crew, practically helpless and derelict in the Gulf of Mexico by the tug Ionian and brought to anchorage off South Pass. She was taken thence to safe harbor in New Orleans by the tug Barranca. She then lay at anchor in the port of New Orleans until about April 4, 1921, practically abandoned by her owner, Bennett. Capt. Lewis and his crew lay idle upon her, consuming the provisions and

stores. They then appealed to the local officials of the United States Shipping Board, who, on authority from the principal office in Washington, D. C., advanced money to pay them off, replaced them with men sufficient to act as caretakers of the vessel, and acted generally as custodian, though no pretense was made of foreclosing the government's mortgage for the purchase price. On June 13, 1921, the original libelant herein, New Orleans Ship Chandlery Company, Limited, filed a libel in rem for provisions and stores furnished the vessel and its crew during January, February, and March, while she lay at anchor at New Orleans.

· On October 19, 1921, the United States and the Shipping Board Emergency Fleet Corporation, as respondents, on motion, obtained an order consolidating the libels filed at Norfolk with this proceeding, in order that all claims against the ship and themselves might be tried and disposed of together. On November 14, the same respondents filed a petition to surrender possession to the court for the purpose of sale. When sold she brought only $3,750, which, by decree of December 11, 1923, was distributed to the two salvors and to the United States, the balance, amounting to $960.71, upon its intervening libel as subrogee of the crew for wages, amounting to some $30,000, which had been advanced and paid by the Shipping Board.

In the opinion preceding that decree, Judge Foster held that, since these three claims absorbed the whole of the proceeds of sale, it was useless to consider the claims of these libelants. They had, however, by their pleading, reserved their rights, if any they had, against the United States of America and the Shipping Board. They contend that they had liens upon the vessel, which they would have been entitled to enforce by proceedings in rem, but for the provisions of sections 1 and 2 of the Suits in Admiralty Act (Act March 9, 1920, c. 95, 41 Stat. 525 [Comp. St. §§ 1251¼, 1251¼a]), which compelled them to proceed in personam against the owners; that, since the act of sale to Bennett had not been recorded in the custom house and on the ship's papers, at the time the bills were contracted, they had a right to assume that the United States was still the owner of the ship; that, moreover, the ship was actually in possession of the Shipping Board, an agency of the United States, at the time their libels were filed, and therefore they are entitled to personal judgment against the government and its said agency.

These contentions seem little more than specious. The record shows that the first libel was filed in Norfolk by Capt. Lewis just after he and his crew had cajoled the Shipping Board into paying them off at New Orleans. His intimate knowledge of the status of the ship and the title to it is revealed in his libel. Moreover he was the active agent of the owner, Bennett, who had employed him directly, and for whom he took formal possession of the ship as master. He cannot be sustained in the pretense of having advanced wages to his crew upon the credit of the ship, and also of the United States of America, as owner, under the circumstances disclosed by the record. Apart from this consideration, his status is the same as that of the other three libelants, who filed their libels at Norfolk and were represented by the same firm of proctors who represented Capt. Lewis. They repeat generally the same allegations as those made by him.

The testimony shows that these supply people furnished the supplies on the order of Capt. Lewis; that they made no inquiry as to the ownership of the vessel, made no request to see the ship's papers, and relied solely on the general presumption in favor of furnishers of provisions and supplies under section 30, subsections P, Q, and R, of the Merchant Marine Act of June 5, 1920 (41 Stat. 1000–1005 [Comp. St. §§ 8146¼ooo, 8146¼p, 8146¼pp]). Whilst it is true that they were entitled to presume, under subsection Q, that the master of the vessel, at the port of supply, had authority from the owner to bind the vessel, so that maritime liens might attach to it, it is very doubtful whether they used that reasonable diligence contemplated by subsection R, which provides: "But nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." However, since the record does not show that the agreement for the sale of the vessel was aboard the vessel at the time and available for their inspection, that doubt may be resolved in their favor. In consequence, the four libelants may be taken as entitled to maritime liens on the vessel.

[1] It does not follow from this, however, if they were additionally entitled to sue the owner in personam, that they should have a right of action against any but the actual owner. Since George S. Bennett was in fact the owner in possession of the vessel at the time the supplies were furnished, such suit should

have been brought against him as owner. The evidence negatives any pretense that the supplies were furnished on the credit of the United States or its agency, the Shipping Board, as owner, because no inquiry whatever was made into the matter of ownership by any of them.

Since the total proceeds were absorbed in payment of lienors who preranked these libelants, and since the United States waived and abandoned its claim for the large balance due it as subrogee for seaman's wages, and made no demand whatever under its preferred mortgage for $112,500, surrendering the ship out of the possession which it held as a mere custodian or stakeholder, it is not necessary to determine the relative priorities between these libelants and the respondents. Undoubtedly the government's rank as mortgage creditor would be posterior to all liens which attached prior to its recordation in the custom house and indorsement on the ship's papers. Morse Drydock & Repair Co. v. Northern Star, 271 U. S. 552, 46 S. Ct. 589, 70 L. Ed. 1082. But, under the circumstances of this case, the status of its mortgage need not be considered at all.

It is certain that the libelants suffered no damage or loss because of the failure of the government to prosecute its claim for the balance due it as subrogee of the seamen, or to execute its mortgage, nor was their status as lienors impaired or affected in any manner by the fact that the Suits in Admiralty Act relieved the United States of in rem proceedings. Moreover libelants elected to proceed against the United States and the Shipping Board long after the sale to Bennett was of record, instead of proceeding in rem against the vessel, just as the New Orleans Ship Chandlery Company did here on June 13, 1921. There is no evidence to justify imposition of liability for depreciation in the value of the vessel between April and November to the United States, or to the Shipping Board, or to show any damage to the vessel while it was laid up at New Orleans. Even if there had been such depreciation, due to the negligence of the Shipping Board while the vessel was in its custody, this would, nevertheless, not account for the filing of these libels against the respondents in personam during April and May, long prior to the delays preceding the sale, of which they complain in their brief.

If the depreciation was due entirely to a falling market, then it is attributable no less to themselves than to the respondents, since they were parties to this proceeding and contributed to the delays. On the contrary, the evidence shows that the vessel's boilers and machinery were in an almost useless state within 20 days of her departure from Norfolk, and before she was towed into New Orleans, helpless; and this was from 3 to 4 months before they filed any proceedings whatever. In the final analysis, therefore, these libelants depend upon their own assumption that the government and its agency assumed personal liability to the ship's creditors by taking charge of the vessel upon its abandonment. A fair consideration of the action of the Shipping Board, however, convinces me that the service rendered was in the nature of a salvage, for the benefit of all persons in interest.

[2] Even though the United States might be considered as owner at the time the liens arose, or at the time the libels were filed, or at the time the vessel was surrendered into court, under the circumstances of this case the issue would be disposed of by the fact that the limit of recovery would be the value of the vessel. The courts have repeatedly held that the Suits in Admiralty Act merely substitutes a remedy in personam, upon in rem principles, for a remedy in rem against the vessel, when owned by the government. Otherwise the status of the government is precisely that of a private owner. If the Minnesota had been privately owned, the limit of recovery would have been her value at the time of her seizure or surrender. No more personal liability attaches to the United States, as owner, than would attach to a private owner. See United States v. Neptune Line (C. C. A.) 12 F. (2d) 568, citing: The Barnstable, 181 U. S. 464, 21 S. Ct. 684, 45 L. Ed. 954; The Western Maid, 257 U. S. 419, 42 S. Ct. 159, 66 L. Ed. 299; The Lake Monroe, 250 U. S. 246, 39 S. Ct. 460, 63 L. Ed. 962; Blamberg Bros. v. U. S., 260 U. S. 452, 43 S. Ct. 179, 67 L. Ed. 346; Shewan & Sons v. U. S., 266 U. S. 108, 45 S. Ct. 45, 69 L. Ed. 192.

Accordingly a decree may be entered in favor of respondents, dismissing the libels in these consolidated cases at libelants' costs.