## WHAN et al. v. GREEN STAR S. S. CORPORATION.

## UNITED STATES v. ADAMS.

Circuit Court of Appeals, Second Circuit.
November 14, 1927.

No. 149.

1. Receivers ⬅152—Notes payable to United States for price of vessel requisitioned by Shipping Board during construction held entitled to priority on appointment of receiver for purchaser (Shipping Act 1916 [46 USCA § 801 et seq.]; Urgency Deficiency Act, § 1, cl. "e" [31 USCA § 191]).

Under Shipping Act 1916 (46 USCA § 801 et seq.; Comp. St. § 8146a et seq.), creating Shipping Board and Emergency Fleet Corporation, and particularly section 9 thereof, making vessels purchased, chartered, or leased from Shipping Board, and employed as merchant vessels subject to all laws, regulations, and liabilities governing merchant vessels, claim of United States on notes payable to United States for price of vessel which had been requisitioned by Fleet Corporation during construction for use of United States, under Urgency Deficiency Act, § 1, cl. "e" (40 Stat. 182), held entitled to priority under Rev. St. § 3466 (31 USCA § 191), on appointment of receiver for purchaser, since United States alone could sue on notes, notwithstanding Shipping Board acted as its agent in constructing and selling vessels, in view of Act July 18, 1918, § 15 (40 Stat. 913), and Suits in Admiralty Act (46 USCA § 741 et seq.; Comp. St. § 1251¼ et seq.).

2. Taxation ⬅5—Property acquired by United States in its own name by corporate agent is not taxable by state.

Property acquired in its own name by the United States by its corporate agent is not subject to taxation by the state.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Archibald H. Whan and others, copartners doing business under the firm name and style of A. H. Whan & Co., against the Green Star Steamship Corporation, in which a receiver for defendant's property

was appointed. An order of a special master, disallowing in part claim of priority filed by the United States, was affirmed by the District Court, and the United States appeals. Reversed.

Charles H. Tuttle, U. S. Atty., of New York City (Walter Schaffner, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Chadbourne, Hunt, Jaeckel & Brown, of New York City (William M. Chadbourne, Clinton De Witt Van Siclen, Carroll R. Ward, and Alfred H. Phillips, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. A creditor's bill, based upon the allegations of solvency of the Green Star Steamship Corporation, of present inability to pay its large indebtedness as the debts matured, and pleading danger that its assets would be dissipated, resulted in a decree appointing a receiver to conserve the same, after an answer was interposed, admitting all these allegations of the bill. The receiver appointed proceeded with the administration of the affairs of the corporation, and among other things received the claims of creditors. The United States of America filed a claim for $7,046,799.41, asserting priority under section 3466 of the Revised Statutes (31 USCA § 191) as to $1,379,302.60. The claim of priority is contested. A special master appointed by the District Court considered the question and reported, disallowing the priority of the claim. The District Judge later approved the report. A stipulation of facts, on which the claim was heard, provided that, if priority be disallowed as to the part of the claim based on 10 promissory notes, made March 24, 1920, by the corporation, and payable to the United States of America, the balance of the claim would be allowed. On February 12, 1920, by a bill of sale duly executed, the United States of America sold and delivered the steamship Canibas to the Green Star Steamship Corporation and received in part payment these notes. A credit was allowed on the full claim in the sum of $130,772.88, which came from the proceeds of a resale of the vessel, and which was received by the United States, leaving the balance.

[1] Section 3466 of the Revised Statutes provides that, whenever any person indebted to the United States is insolvent or unable to pay in full, the debts due to the United States shall be first satisfied, thus establishing priority, and this applies where a voluntary assignment is made, or to cases in which an act of bankruptcy is committed. The Supreme Court in United States v. Butterworth-Judson Corporation, 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380, held that the provisions of section 3466 applied to a case of equity receivership in which the defendant, by its answer, joined in the prayer for the appointment of a receiver if the defendant, at the time, was actually insolvent. It was further held that such action by the defendant amounted to a voluntary assignment, and therefore an act of bankruptcy, and this, although there was a positive allegation in the bill that the defendant was solvent. The principal contention by the receiver, which he urged below, and now here, is that the legislation which created the Shipping Board and Emergency Fleet Corporation of the United States, makes this case different in principle from that of the Butterworth Case. The question is presented whether the United States, by this legislation, has lost its sovereign right of priority as to this indebtedness.

By the Shipping Act of 1916 (39 Stat. 728 [46 USCA § 801 et seq.; Comp. St. § 8146a et seq.]), Congress provided for the creation of the Shipping Board, consisting of five commissioners, to be appointed by the President. It authorized the board to construct and equip, or to purchase, lease, or charter, "vessels suitable, as far as the commercial requirements of the marine trade of the United States may permit, for use as naval auxiliaries or army transports, or for other naval or military purposes," and to charter, lease, or sell such vessels to private persons, citizens of the United States. Section 11 of the act (46 USCA § 810; Comp. St. § 8146f) authorized the board, in its discretion, to organize, under the corporation laws of the District of Columbia, corporations "for the purchase, construction, equipment, lease, charter, maintenance, and operation of merchant vessels in the commerce of the United States." As a result, the Fleet Corporation was organized by the board on April 16, 1917, with powers granted akin to that of private industrial corporations. This section provided that the United States should not become a minority stockholder, and, indeed, it did buy all but the qualifying shares. The board of trustees consisted of the commissioners of the Shipping Board. It was authorized to use $50,000,000, appropriated by Congress, and this money was used in the construction of merchant vessels suitable for

use in mercantile trade. The Urgent Deficiencies Act of June 15, 1917 (40 Stat. 182), expanded the scope of the shipping enterprise under the act of 1916, by increasing the appropriations for the construction, purchase, and operation of merchant vessels. Powers were granted for the requisitioning of ships, plants, and materials, and by it Congress conferred powers upon the President to exercise the requisition of ships, and this through such agency or agencies as he should select. It resulted in the Emergency Fleet Corporation and the Shipping Board coming into being. Congress intended that the Fleet Corporation and the Shipping Board should be used for the purposes referred to under the act of 1916. The Lake Monroe, 250 U. S. 246, 39 S. Ct. 460, 63 L. Ed. 962.

On June 11, 1917, by executive order, the President delegated to the Fleet Corporation all the powers conferred by the Emergency Shipping Fund Act, in so far as they related to the construction of vessels or the requisition and completion of vessels in the process of construction. The order delegated to the Shipping Board powers relating to the requisition of completed vessels, and the management, operation, and disposition of all vessels acquired under the act. And this order provided that all the powers conferred upon the Shipping Board might be exercised either by the board directly, or through the United States Shipping Board Emergency Fleet Corporation, or through any other corporation organized by it for such purpose. And section 9 of the act of 1916 (46 USCA § 808; Comp. St. § 8146e) provided:

"Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein."

The Supreme Court described the effect of these provisions of the statute in The Lake Monroe, supra, thus: ·

"But at the time of the emergency provision of June 15, 1917, the Shipping Board had been established as a public commission, with broad administrative powers and subject to definite restrictions, and the Fleet Corporation had been created as its agency, financed with public funds. The emergency shipping legislation evidently was enacted in the expectation that the President would employ the Shipping Board and the Fleet Corporation as his agencies to exercise the new powers, for the Fleet Corporation was mentioned in the act, and it was known to be but an arm of the board."

That Congress continued to recognize the Fleet Corporation as an agent of the United States is illustrated by the Act of July 18, 1918 (40 Stat. 913) wherein it provides in section 15 that:

"The net proceeds derived from any activity authorized in * * * the division entitled 'Emergency Shipping Fund' of the Act of June 15th, 1917, * * * shall be deposited in the Treasury in a separate and distinct fund and may be expended by the President in carrying out the purposes of this act, and within the limits of the amounts heretofore or hereafter authorized, for the construction, requisitioning, or purchasing of vessels."

Clause (e), section 1, of the Urgency Deficiency Act (40 Stat. 182), giving the right to requisition vessels in the process of construction, was limited "for use or operation by the United States."

It was under this authority that the steamship Canibas came under the control of the Fleet Corporation. On August 3, 1917, the Canibas, while in the course of construction, was registered by the Fleet Corporation through the executive order of the President, dated July 11, 1917. She was completed by the Texas Steamship Company under contract with the Fleet Corporation. At completion, she was delivered to the Division of Operation, and after operation in the merchant trade, under operating agreements entered into by the Fleet Corporation, she was finally delivered to the Green Star Steamship Corporation. The agreement for operation provided that the operating revenues went to the Fleet Corporation. Upon completion, registered in the name of the United States, she was sold to the Green Star Steamship Corporation under a contract of sale providing for payment of 25 per cent. in cash and the balance in ten promissory notes, which make up the claim for which priority is here made. These notes were made payable directly to the United States of America, or order, and payable at the office of the U. S. Shipping Board. The proceeds of the sale were paid into the Treasury of the United States to the credit of the Fleet Corporation, and it may be assumed that these notes, if paid, would have gone into the Treasury, as did the cash payment.

Reliance for support of the order below is placed on the decision in Mellon v. Michigan Trust Co., 271 U. S. 236, 46 S. Ct. 511, 70 L. Ed. 924. There the Supreme Court

held that a debt due the Director General of Railroads and asserted in his name was not entitled to priority under section 3466. It reaffirmed Dupont de Nemours & Co. v. Davis, 264 U. S. 456, 44 S. Ct. 364, 68 L. Ed. 788, where it was held that a suit by the Director General was in effect a suit by the United States, and therefore not subject to the statute of limitations, and that in taking over and operating the railroads the United States acted in its sovereign capacity. The basis for the decision in the Michigan Trust Co. Case is referred to as, "The broad spirit and purpose of the provisions of section 10 of the Federal Control Act (40 Stat. 451) were inconsistent with priority," and the court said that the decision turned upon the effect to be given to section 10 of the Act of 1918 (40 Stat. 456 [Comp. St. § 3115¾ j]). As there pointed out, that section made carriers under federal control subject to all loss and liabilities as common carriers, whether arising under state or federal laws, or at common law, except in so far as they may be inconsistent with the provision of the act applicable to federal control or by order of the President. It was directed that actions at law or suits in equity be brought against the carriers and judgments rendered "as now provided by law." In any action at law or suit in equity against the carrier, no defense could be interposed upon the ground that the carrier was an instrumentality or agency of the federal government. Nor were the carriers entitled to have transferred to the federal court any action instituted by or against them which was not transferable prior to the federal control of the carrier, and any action which had theretofore been so transferred because of federal control, or any act of Congress or official order or proclamation relating thereto, should, upon motion of either party, be retransferred to the court in which it was originally instituted. It provided that no process should be levied against any property under federal control, and the operating agent of railroads has been denied a preference in bankruptcy. Davis v. Pringle, 268 U. S. 315, 45 S. Ct. 549, 69 L. Ed. 974.

Section 9 of the Shipping Act is not the equivalent, practically or otherwise, of section 10 of the Federal Control Act. It provides for subjection to laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner or holder in part, and of any mortgage, lien, or interest therein, to vessels while employed solely as merchant vessels. Title

to the Canibas was in the United States, and, in selling it, it is apparent it determined to recognize that title, for it insisted upon the notes being made payable to the United States of America. The fact that the Fleet Corporation was used to construct vessels, and to act as agent in selling or disposing of them, does not alter this determination. The United States, in this instance, has no priority other than that given by section 3466 of the Revised Statutes. United States v. Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638. It may likewise be admitted that debts payable directly to the Fleet Corporation have no priority. U. S. Shipping Board Emergency Fleet Corp. v. Wood, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762. Likewise the principle is recognized that, when the United States enters a commercial enterprise, it divests itself of its sovereign character, and takes the character of those it associates with, and may be sued. Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 906, 6 L. Ed. 244. As where it enters the insurance business, it may be sued on its policies. Standard Oil Co. v. United States, 267 U. S. 76, 45 S. Ct. 211, 69 L. Ed. 519. And so, if one of its stock-owned corporations is defrauded, a criminal conspiracy against that corporation is not against the United States. Salas v. United States (C. C. A.) 234 F. 842.

In King County v. Fleet Corporation (C. C. A.) 282 F. 950, in an action brought by the Fleet Corporation to restrain King County, Washington, from levying upon property held in the name of the Fleet Corporation for nonpayment of taxes, it was held that property standing in the name of the Fleet Corporation, acquired by it under the powers conferred by the Emergency Fleet Corporation and the executive orders pursuant thereto, was the property of the United States. This was expressly approved in Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328, where a corporation organized by the United States under the laws of the state of Washington, for the purpose of facilitating the production of spruce for aeroplanes, acquired title to land in the state of Washington. This property was held to be exempt from tax, because it was property of the United States.

The Suits in Admiralty Act (41 Stat. 525 [46 USCA § 741 et seq.; Comp. St. § 1251¼ et seq.]) of March 9, 1920, provided that no vessel or cargo owned by the United States or by any corporation, excepting the Panama Railroad Company, in which it, or its representatives, owned all the capital

stock, could be arrested or seized by judicial process. It further provided that, in any case where, if such vessel or cargo were privately owned or possessed, a proceeding in admiralty could be maintained, then, in such case, a libel in personam might be filed against the United States. Judgment recovered in such proceedings must be paid by the Treasurer of the United States upon presentation of certified copies thereof, and the act contained an appropriation necessary therefor. It thus appeared again that it was intended by Congress that it was property of the United States, and that it would be liable for any debts incurred in the shipping enterprise. The act also contained provisions relating to the Merchant Marine Act of June 5, 1920 (41 Stat. 988 [46 USCA §§ 861–889; Comp. St. §§ 8146¼–8146¼jj]) containing in its preamble an expression of the same views of Congress as to the purposes of the shipping legislation and the reasons for the creation of the Shipping Board and the grant of power conferred upon it. The transfer to the board of the war-time powers of the President with respect to shipping provided for the sale by the board, as it was deemed advisable, to private interests, of ships which it controlled, and also it again appropriated a large sum of money to be used for the construction of vessels and the maintenance of steamship lines by the board.

The Ship Mortgage Act therein contained provided for a new type of marine mortgage, known as a preferred mortgage, all of which, although passed after the sale in question, shows the continued intent of Congress in relation to this legislation to engage in this mercantile enterprise as a sovereign as a part of its political policy, as pointed out in Berizzi v. The Pesaro, 271 U. S. 562–574, 46 S. Ct. 611, 612 (70 L. Ed. 1088): "We think the principles are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans and operates ships in the carrying trade, they are public ships in the same sense that warships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a naval force."

As said in Mellon v. Michigan Trust Co., 271 U. S. 236, 46 S. Ct. 511, 70 L. Ed. 924, it was for Congress to determine whether or not claims arising out of such operation should have priority when the debtor made a voluntary assignment. And under the Federal Control Act Congress exhibited a plain intent that the government would operate the carriers waiving the usual immunity of a sovereign for legal liability and to permit operation by the carriers. Missouri Pac. R. R. Co. v. Ault, 256 U. S. 554, 41 S. Ct. 593, 65 L. Ed. 1087. The Federal Control Act was an emergency provision, intended to accomplish the purposes of uniform operation in order to facilitate the movement. of troops and supplies. In the shipping enterprises, the United States requisitioned title and built ships; it appropriated money to others to build them. The shipping enterprise did not cease after the end of the war. [2] Property acquired in its own name, but by an agent, its corporation, is not subject to taxation by the state. Clallam v. United States, supra. The title to the railroads remained in the respective corporations. The government acquired its own fleet, and operated it as a government enterprise, and nobody but the government had an interest in it. Whenever a ship was requisitioned, title was acquired. Unlike in the case of the railroad enterprise, the Suits in Admiralty Act provides for suits against the United States, and judgments are to be paid out of the treasury of the United States, and it pledges the entire credit of the United States to their payment.

Much reliance is placed upon the decision in United States v. Woods, supra. In that case the Fleet Corporation filed a claim in its own name, in which it claimed that it was entitled to priority as a governmental agent. In the Supreme Court priority was denied, upon the ground that it had not been claimed by the United States. The Supreme Court said that the claim had been filed in the name of the Fleet Corporation, and it was not entitled to priority. Later the United States filed a bill in equity, in which it asserted that its agent, the Fleet Corporation, had entered into contracts which were the basis of the claim referred to; that the debts were due in fact to the United States as a trust, being impressed upon the funds then in the hands of the trustee in favor of the United States, upon the ground that the claim, which had been filed in the name of the Fleet Corporation, was entitled to priority. The bill was dismissed, and this was sustained by the Circuit Court of Appeals. From the opinion it is apparent that the court reached that conclusion because there was no jurisdiction to entertain such a bill, jurisdiction being in the

court of bankruptcy, and that the claim was not due the United States, but was due the Fleet Corporation, and it was not therefore entitled to priority. The case was affirmed by the Supreme Court on the authority of Fleet Corporation v. Woods (258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762), in 263 U. S. 680, 44 S. Ct. 134, 68 L. Ed. 503. It is apparent that, although in the first Woods Case appeal priority was denied, the claim which had been presented in the name of the Fleet Corporation was allowed to stand, for the order was affirmed. Therefore there was a general claim filed in bankruptcy, when the United States filed its bill seeking priority or to impress a trust for the same claim in the hands of the trustee. The United States did not deny the agency of the Fleet Corporation in the second suit, but claimed that it was acting for it, and not in an individual capacity. A judgment against the Fleet Corporation was likewise binding against the United States, and therefore the question was settled. The claim arose by the indebtedness of the Eastern Shores Shipbuilding Corporation. It was but one debt, and it was impossible to say that it was owed by the Fleet Corporation for the full amount as allowed as a general claim, and that it was also liable as a preferred claim against the United States.

At bar no such question may arise, for the notes and contract were in the name of the United States as the seller, and it alone could file a claim based upon the notes. It alone could maintain a suit for recovery on the notes. No congressional intention may be spelled out of the legislation referred to, which would make a note, taken in the name of the United States, a note payable to the Fleet Corporation. Priority is granted as an attribute of sovereignty, as is immunity. As said in the Merchant Marine Act of 1920 it was necessary "for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency." In the shipping legislation referred to, it is apparent Congress was carrying out this function of the government. The Pesaro, 255 U. S. 216, 41 S. Ct. 308, 65 L. Ed. 592. The United States of America was the only creditor in whose name the claim could be presented under the circumstances herein described, and, since it was a debt owing to the United States by a creditor whose affairs had been taken over in receivership, it was entitled to priority.

Order reversed.