**UNITED STATES of America, Appellee,**

v.

**Alfred LABAT, Defendant–Appellant.**

**No. 950, Docket 89–1368.**

United States Court of Appeals,
Second Circuit.

Argued March 2, 1990.

Decided May 25, 1990.

John G. Duncan, Asst. U.S. Atty., Syracuse, N.Y. (Frederick J. Scullin, Jr., U.S. Atty. for the N.D. of N.Y., Syracuse, N.Y., on the brief), for appellee.

Cesar De La Puente, Miami, Fla. (Cesar M. de la Puente, P.A., Miami, Fla., on the brief), for defendant-appellant.

Before OAKES, Chief Judge, KEARSE and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Alfred Labat appeals from a judgment entered in the United States District Court for the Northern District of New York, following a jury trial before Howard G. Munson, *Judge*, convicting him on one count of conspiracy to distribute and to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988) and 18 U.S.C. § 2 (1988), one count of possession of cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of use of a communication facility to commit a narcotics felony, in violation of 21 U.S.C. § 843(b) (1988). Labat was sentenced principally to concurrent prison terms of 60 months on the possession count, 51 months on the conspiracy count, and 48 months on the communication facility count; the prison terms were to be followed by four years' supervised release. On appeal, Labat contends that the evidence was insufficient to convict him of any of these offenses. We agree as to the possession count; in all other respects, we affirm.

## I. BACKGROUND

Labat and several others were named in a seven-count indictment charging them with various narcotics offenses. All of the other defendants entered pleas of guilty. Labat, charged in three counts, was tried alone.

The government's case against Labat was presented principally through the testimony of codefendant Ralph Moon, unindicted coconspirator Joseph Ray, who, like Moon, had pleaded guilty to narcotics violations, and Investigator James Mathews, a New York State police officer working with the Federal Bureau of Investigation. The government also introduced tape recordings of ten telephone conversations between Moon and Labat between December 20, 1987, and January 21, 1988. The trial evidence, taken in the light most favorable to the government, showed the following.

Labat was a resident of Florida whom Moon had known for some 12 years; prior to 1985, the two had engaged in cocaine trafficking in Florida. In 1985, Moon moved to New York; from 1985 until early 1988, Moon engaged in sales of cocaine and marijuana with Ray in the vicinity of Fulton, New York. As discussed in greater detail in Part II.A. below, in December 1987, Moon, in New York, had several telephone conversations with Labat, in Florida, with respect to Labat's efforts to obtain one-to-two kilograms of cocaine to sell to Moon at $17,000 to $18,000 per kilo.

Beginning in the spring of 1987, Mathews, working in an undercover capacity, had purchased smaller quantities of cocaine and marijuana from Moon on a number of occasions. On January 15, 1988, Mathews told Moon he was interested in purchasing a kilogram of cocaine. Moon suggested that he and Mathews could travel together to Florida and purchase the desired kilogram for $18,000 from Labat. After conferring with Ray, Moon suggested, as an alternative, that Mathews could obtain a kilogram of cocaine from Ray for $30,000. Moon and Mathews parted company, leaving both options open.

On January 18, 1988, Labat telephoned Moon and said he would try to obtain one

kilogram of cocaine at a price of $22,000, and personally deliver it to Moon in New York. Over the next two days, Moon informed Mathews that he could obtain one kilo from Labat for $22,000; Ray renewed his offer to provide a kilo for $30,000. On Thursday, January 21, Labat called Moon and told him, "there's no problem on the numbers." He said he had not seen the cocaine in question, which was at a location between Florida and New York, but was working on the details of inspecting it and transporting it to Moon. Labat promised to have details for Moon the following Monday.

In the meantime, however, Ray decided to obtain the cocaine for sale to Mathews from another source at a lower price. Thus, on January 22, Ray left New York to drive to Florida, where he purchased one kilo of cocaine for $16,000 from one Randy Dentel. Ray returned to New York on January 26; on January 29, Moon and Ray sold that kilogram of cocaine to Mathews for $30,000. This prosecution soon followed.

Labat was charged with one count of conspiring with Moon and others to distribute and to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2, one count of aiding and abetting the possession of the cocaine sold to Mathews, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and one count of using a communication facility, i.e., the telephone, to commit, or to cause or facilitate the commission of, a narcotics felony, in violation of 21 U.S.C. § 843(b). Testifying at trial, Labat did not deny that he had discussed supplying cocaine to Moon, but he said (a) he did not in fact attempt to find any cocaine to provide to Moon and never intended to do so, and (b) he did not know Ray and the other coconspirators and did not know that Moon ever considered obtaining cocaine from another source. The jury found Labat guilty on all three counts, and he was sentenced as indicated above.

## II. DISCUSSION

On appeal, Labat contends that the evidence was insufficient to support his conviction of any of the charged offenses. For the reasons below, we reject his challenge with respect to the conspiracy and telephone counts; but we conclude that the evidence was insufficient to support his conviction on the possession count.

### A. *The Conspiracy and Telephone Counts*

■ In challenging his conviction for conspiracy, Labat contends that the evidence showed that he did not know, never heard of, and never talked with Ray or any of Moon's other coconspirators. Though conceding that the evidence showed a conspiracy among Moon, Ray, and others, Labat contends that there was insufficient proof that Labat joined that conspiracy. His arguments lack merit.

■ In order to prove a conspiracy charge against a given defendant, the government must present " 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.' " *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir.1989) (quoting *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984)). Both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence. *See, e.g., United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Young*, 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). The defendant need not know the identities of all of the other conspirators, nor all of the details of the conspiracy. *See Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). Since the essence of conspiracy is the agreement and not the commission of the substantive offense that is its objective, the offense of conspiracy may be established even if the collaborators do not reach their goal. *See United States v. Abel*, 258

F.2d 485, 489 (2d Cir.1958), *aff'd on other grounds,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

■ In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *United States v. Adegbite,* 877 F.2d 174, 179–80 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989); *United States v. Chang An–Lo,* 851 F.2d 547, 553 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). In reviewing such a challenge, we must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983); *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *United States v. Buck,* 804 F.2d 239, 242 (2d Cir. 1986); *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). Labat has not carried his burden with respect to the conspiracy count.

Both the furtiveness and the contents of the telephone conversations permitted the jury to find that Labat knew Moon was associated with others in a scheme to possess and distribute at least one-to-two kilograms of cocaine and that Labat in fact agreed to join that conspiracy. Frequently a call to or from Labat's home was made simply to arrange a subsequent conversation in which Labat would use a pay telephone. The ensuing conversations then were carried on in a code that used the word "shoe" to denote a kilogram of cocaine. For example, when Moon told Labat in a December 21, 1987 conversation that he wanted one kilogram of uncut cocaine for $14,000, Labat responded that he could not sell uncut cocaine for that price ("I don't think I can do it unless—unless you want to take something that's less quality"), and that he could not sell a kilogram of that purity for less than $17–18,000 ("I don't think I'd be able to—to sell a shoe for less than 17, 18"; "[t]hose shoes don't go any cheaper"). Moon said he actually had $16,000, needed a whole kilogram, and did not want to settle for lower purity, so he would take what Labat was offering. Labat asked "so how are you gonna come up with the . . . ?" (Ellipsis represents pause.) Moon said that though $16,000 was all he and his "associate" had, he would get the rest from a friend. Moon again insisted that the cocaine be uncut ("there can't be no—no wear on the shoe at all, you know what I'm saying?"), and Labat assured him that he would be satisfied. In later conversations, Moon sought to purchase two kilos of cocaine; Labat kept Moon informed as to his efforts to obtain the desired cocaine, sought reassurance that Moon had the money, and said he would work out the details for inspection and delivery. Labat stated that he might bring the cocaine to New York personally, and he insisted that his meeting there be with Moon alone.

In all, the evidence was sufficient to permit a rational juror to infer beyond a reasonable doubt that Labat knew that Moon and at least one associate were engaged in a conspiracy to possess and distribute narcotics and that Labat joined that conspiracy. In light of the sufficiency of the evidence to support his conviction for conspiracy, Labat's challenge to his conviction for using the telephone to facilitate that crime is similarly without merit.

### B. *The Possession Count*

Labat's conviction on the possession count is a different matter. The government concedes that there was no evidence that Labat ever supplied any cocaine to Moon during the period in question and that Labat never had possession of the cocaine sold to Mathews, which Ray had obtained from Dentel, not from Labat. It argues, however, that Labat's conviction for possession may be upheld either on the theory that Labat aided and abetted the possession by Moon and Ray of the kilogram of cocaine eventually delivered to Mathews or on a *Pinkerton* theory, *see Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). We disagree.

To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime. *See United States v. Wiley*, 846 F.2d 150, 154 (2d Cir.1988); *United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir.1985). To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime. *See, e.g., United States v. Gallishaw*, 428 F.2d 760, 763 (2d Cir.1970); *see also Nye & Nissen v. United States*, 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (aiding and abetting theory supports liability when the defendant "consciously shares in" the underlying criminal act). A general suspicion that an unlawful act may occur is not enough. *See, e.g., United States v. Wiley*, 846 F.2d at 154; *United States v. Zambrano*, 776 F.2d at 1097. The government must also show that the defendant had some interest in furthering the unlawful act, *see United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir.1977), and that he "consciously assisted the commission of the specific crime in some active way," *United States v. Dickerson*, 508 F.2d 1216, 1218 (2d Cir.1975). In sum, aiding and abetting is not proven unless it is shown that the defendant joined the specific venture and shared in it, and that his efforts contributed to its success. *See, e.g., United States v. Wiley*, 846 F.2d at 154.

The evidence with respect to the possession count did not meet these standards. It did not show any connection between Labat and Dentel. Nor did it show that Labat attempted or desired to further a cocaine purchase by Moon from any other source; indeed, since there was no evidence that Labat was to receive any benefit unless he himself sold cocaine to Moon, it was plainly contrary to Labat's interest to have Moon purchase from a source other than Labat. Nor was there any evidence that Labat's efforts made any contribution whatever to Moon's obtaining the cocaine from Dentel. Accordingly, the evidence did not support the verdict that Labat was guilty of aiding and abetting possession of the cocaine obtained from Dentel.

The government's *Pinkerton* theory fares no better, though for another reason. Under this theory, a coconspirator who does not directly commit a substantive offense may nonetheless be held liable for that offense if it was committed by another coconspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement. *See, e.g., Pinkerton v. United States*, 328 U.S. at 646–47, 66 S.Ct. at 1183–84; *United States v. Ciambrone*, 787 F.2d 799, 809 (2d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *United States v. Pugliese*, 712 F.2d 1574, 1583 (2d Cir. 1983). Even if it were a reasonably foreseeable consequence of the conspiracy in which Labat joined that Moon and the other defendants would obtain cocaine instead from an unrelated source, the *Pinkerton* theory is not available on this appeal, for the jury was not instructed that it could find Labat guilty of possession on this basis. We may not permissibly infer either that the jury found Labat guilty on a theory as to which it was not instructed, *see, e.g., Nye & Nissen v. United States*, 336 U.S. at 618, 69 S.Ct. at 769 (verdict may not be upheld on *Pinkerton* theory without "submission of those fact issues to the jury"); *United States v. Brown*, 823 F.2d 591, 599 (D.C.Cir.1987), or that, had the jury been properly instructed on that theory, it would have found him guilty on that basis, *cf. Dunn v. United States*, 442 U.S. 100, 106–07, 99 S.Ct. 2190, 2194, 60 L.Ed.2d 743 (1979).

## CONCLUSION

For the foregoing reasons, the conviction on the possession count is reversed, and the matter is remanded for dismissal of that count. In all other respects, the judgment of conviction is affirmed.